IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

JEAN GOLDMAN,                        §
                                     §
        Plaintiff,                   §
                                     §
v.                                   §        CIVIL ACTION NO. H-14-433
                                     §
CHARLES WILLIAMS, BRIAN SKERO,       §
and MONTGOMERY COUNTY, TEXAS,        §
                                     §
        Defendants.                  §

## <u>MEMORANDUM AND RECOMMENDATION</u>

Pending before the court[1] are Defendant Montgomery County's
Motion to Dismiss Plaintiff's Second Amended Complaint for Lack of
Subject Matter Jurisdiction and for Failure to State a Claim (Doc.
41); Defendant Brian Skero's ("Skero") Motion for Summary Judgment
(Doc. 48); Defendant Charles Williams' ("Williams") Motion for
Summary Judgment (Doc. 59); Defendant Williams' Supplemental Motion
for Summary Judgment (Doc. 85); Defendant Skero's Supplement to
Motion for Summary Judgment (Doc. 86).

The court has considered the motions, all of the briefs, the
summary judgment evidence, and the applicable law. For the reasons
set forth below, the court **RECOMMENDS** that Defendant Montgomery
County's motion to dismiss be **GRANTED**, Defendant Skero's motions
for summary judgment be **GRANTED**, Defendant Williams' motions for

---

[1] This case was referred to the undersigned magistrate judge pursuant
to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the
Civil Justice Reform Act, and Federal Rule of Civil Procedure 72. Doc. 22.

summary judgment be **GRANTED IN PART AND DENIED IN PART**.

## I.  Case Background

Plaintiff filed this civil rights action against a municipal police officer, a state trooper, and a county for violating Plaintiff's constitutional rights, also asserting various state law causes of action.  The allegations arise out of Plaintiff's arrest for driving while intoxicated and her subsequent detention at the Montgomery County jail.

### A.  <u>Factual Background</u>

### 1.  The Stop and Arrest Based on Summary Judgment Evidence[2]

On February 26, 2012, Plaintiff was traveling from Houston to on Interstate Highway 45 ("I-45") in a black Toyota Prius.[3] Jonathan Gammons ("Gammons"), who was also traveling northbound on I-45, called 911 to report that a black Toyota Prius with Plaintiff's license plate number was unable to maintain a lane.[4] While on the call with Montgomery County 911, Gammons witnessed the Prius hit a construction barrier while in the left-hand lane and lose "quite a few body parts" but continued moving.[5]  Gammons

---

[2]     The facts recounted in this section are relevant only to the pending motions for summary judgment; therefore, the court relied on competent summary judgment evidence.

[3]     <u>See</u> Doc. 49-2, Ex. 2 to Def. Skero's Brief in Support of Summ. J., Tr. of Montgomery Cnty. 911 Call Recording p. 1.

[4]     <u>See</u> <u>id.</u>

[5]     <u>Id.</u> pp. 1-2; Doc. 49-11, Ex. 6 to Def. Skero's Brief in Support of Summ. J., Tr. of Walker Cnty. 911 Call Recording p. 1; <u>see also</u> Doc. 49-4, Ex. 3-A to Def. Skero's Brief in Support of Summ. J., DWI Case Report, Voluntary

reported that the Prius was "still swerving all over the road" and moved to the right-hand lane.[6]  Montgomery County 911 contacted Walker County 911 to report the Prius as the Prius and Gammons neared Walker County.[7]

Gammons reported to the Walker County 911 operator that the driver had "actually straightened up a little bit" but, before hitting the wall, had been "driving on the shoulder of the road for a couple miles at a high rate of speed."[8]  Gammons also told the 911 operator that the driver of the Prius had forced "a couple of cars into different lanes."[9]  As the 911 operator was wrapping up the conversation, he asked Gammons to call back if the driving got worse or anything changed.[10]  Gammons responded, "Well, it's actually starting to get worse.  He almost bumped a car."[11]  The 911

---

Statement of Gammons p. 18 (stating that parts flew off the car when it contacted the concrete barrier in a construction zone).

[6]     Doc. 49-2, Ex. 2 to Def. Skero's Brief in Support of Summ. J., Tr. of Montgomery Cnty. 911 Call Recording p. 2.

[7]     See id. pp. 2-3; Doc. 49-11, Ex. 6 to Def. Skero's Brief in Support of Summ. J., Tr. of Walker Cnty. 911 Call Recording p. 1.

[8]     See Doc. 49-2, Ex. 2 to Def. Skero's Brief in Support of Summ. J., Tr. of Montgomery Cnty. 911 Call Recording p. 3; Doc. 49-11, Ex. 6 to Def. Skero's Brief in Support of Summ. J., Tr. of Walker Cnty. 911 Call Recording p. 1.  In a statement given at the scene after Plaintiff had been arrested, Gammons said that the Prius also had crossed the yellow stripe on the left lane and drove on the shoulder for approximately one and a half miles at a speed in excess of eighty-five miles an hour.  See Doc. 49-4, Ex. 3-A to Def. Skero's Brief in Support of Summ. J., DWI Case Report, Voluntary Statement of Gammons p. 18.

[9]     Doc. 49-11, Ex. 6 to Def. Skero's Brief in Support of Summ. J., Tr. of Walker Cnty. 911 Call Recording pp. 1-2.

[10]    Id. p. 2.

[11]    Id.

operator disconnected in order to broadcast the information for state troopers in the area but later called Gammons to find out his location.[12]   Gammons reported that a Willis police officer was pulling behind the Prius.[13]

The Willis police officer was Defendant Skero, who had been dispatched pursuant to the 911 call.[14]  As Defendant Skero pursued Plaintiff he observed her "drift across the white highway stripe onto the shoulder and then swerve back to the left."[15]  Once he pulled in behind her, Plaintiff maintained her lane, except when she started to pull onto the shoulder but resumed driving in her lane to pass another car that had pulled onto the shoulder.[16] Plaintiff then pulled onto the shoulder and stopped her car.[17] Defendant Skero was driving directly behind Plaintiff for less than forty-five seconds.[18]  Defendant Skero radioed to report that he had caught up with the vehicle matching the description and requested

---

[12]     Id.

[13]     Id. p. 3.

[14]     See Doc. 49-12, Ex. 7 to Def. Skero's Brief in Support of Summ. J., Decl. of Skero ¶ 2; Doc. 49-4, Ex. 3-A to Def. Skero's Brief in Support of Summ. J., DWI Case Report, Voluntary Statement of Skero p. 15.

[15]     Doc. 49-12, Ex. 7 to Def. Skero's Brief in Support of Summ. J., Decl. of Skero ¶ 3; see also Doc. 49-4, Ex. 3-A to Def. Skero's Brief in Support of Summ. J., DWI Case Report, Voluntary Statement of Skero pp. 15-16; Doc. 49-17, Ex. 11-A to Def. Skero's Brief in Support of Summ. J., Def. Skero's Dash Cam Video Recording.

[16]     See Doc. 49-17, Ex. 11-A to Def. Skero's Brief in Support of Summ. J., Def. Skero's Dash Cam Video Recording.

[17]     See id.

[18]     See id.

back up because he had entered Walker County.[19]

Defendant Skero approached Plaintiff's car and asked Plaintiff to step out of the car with her license and insurance card.[20] Plaintiff complied, limping slightly and holding on to the car as she walked toward the back of the car.[21] Plaintiff denied hitting a wall and claimed that the damage to her car was old.[22]   As Plaintiff walked over to look at the damage to the driver's side of her car, Defendant Skero asked her to return to the rear of the car.[23] Defendant Skero informed Plaintiff that a witness saw her hit a wall; Plaintiff said, "No."[24]  When asked what was causing her to swerve, Plaintiff first said it was because she was sad and then said it was because she had a recent back surgery.[25]

---

[19]     See Doc. 49-4, Ex. 3-A to Def. Skero's Brief in Support of Summ. J., DWI Case Report, Probable Cause Statement p. 4; but see Doc. 49-18, Ex. 12 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Skero's Dash Cam Video Recording p. 1.

[20]     See Doc. 49-17, Ex. 11-A to Def. Skero's Brief in Support of Summ. J., Def. Skero's Dash Cam Video Recording; Doc. 49-18, Ex. 12 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Skero's Dash Cam Video Recording p. 1.

[21]     See Doc. 49-17, Ex. 11-A to Def. Skero's Brief in Support of Summ. J., Def. Skero's Dash Cam Video Recording.

[22]     See id.; Doc. 49-18, Ex. 12 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Skero's Dash Cam Video Recording p. 2.

[23]     See Doc. 49-17, Ex. 11-A to Def. Skero's Brief in Support of Summ. J., Def. Skero's Dash Cam Video Recording; Doc. 49-18, Ex. 12 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Skero's Dash Cam Video Recording p. 2.

[24]     See Doc. 49-17, Ex. 11-A to Def. Skero's Brief in Support of Summ. J., Def. Skero's Dash Cam Video Recording; Doc. 49-18, Ex. 12 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Skero's Dash Cam Video Recording p. 2.

[25]     See Doc. 49-17, Ex. 11-A to Def. Skero's Brief in Support of Summ. J., Def. Skero's Dash Cam Video Recording; Doc. 49-18, Ex. 12 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Skero's Dash Cam Video Recording p. 3.

Defendant Skero walked around Plaintiff's car and stopped in the grass near the front of the car.[26]  Plaintiff began walking toward Defendant Skero, who ordered her to stand at the rear of the car.[27]  Plaintiff returned to the rear portion of the car and leaned her right elbow against the car with her head in her right hand.[28] She stayed in that position as she began speaking with Defendant Skero when he returned to question her.[29]  Defendant Skero asked Plaintiff if she was on any medication, and she indicated that she was not.[30]  When he asked if she had ingested any alcohol, Plaintiff leaned forward and blew at Defendant Skero before answering "No."[31] Plaintiff volunteered to take a drug test.[32]

While explaining that she was traveling from Houston where she had been staying with her mother to her home in Dallas, Plaintiff

---

[26]    See Doc. 49-17, Ex. 11-A to Def. Skero's Brief in Support of Summ. J., Def. Skero's Dash Cam Video Recording.

[27]    See id.; Doc. 49-18, Ex. 12 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Skero's Dash Cam Video Recording p. 2.

[28]    See Doc. 49-17, Ex. 11-A to Def. Skero's Brief in Support of Summ. J., Def. Skero's Dash Cam Video Recording.

[29]    See id.

[30]    See id.; Doc. 49-18, Ex. 12 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Skero's Dash Cam Video Recording pp. 2-3.

[31]    See Doc. 49-17, Ex. 11-A to Def. Skero's Brief in Support of Summ. J., Def. Skero's Dash Cam Video Recording; Doc. 49-18, Ex. 12 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Skero's Dash Cam Video Recording p. 3.

[32]    See Doc. 49-17, Ex. 11-A to Def. Skero's Brief in Support of Summ. J., Def. Skero's Dash Cam Video Recording; Doc. 49-18, Ex. 12 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Skero's Dash Cam Video Recording p. 3.

stepped awkwardly off the pavement into the grass.[33]  Defendant Skero said, "Stand over here so you don't fall down, okay?"[34]

After allowing Plaintiff to get her neck brace out of her car, Defendant Skero pointed to the ground next to the right rear tire and told Plaintiff, "Stay right here for me don't move okay, stay right here."[35]  He returned to his patrol unit.[36]  Within a few seconds of his shutting the car door, Plaintiff moved to the rear of the car and leaned on the hatchback area.[37]  Less than thirty seconds later, Plaintiff opened the hatchback and began going through the items packed in there.[38]

Defendant Skero stepped out of his patrol unit, asking Plaintiff what she was doing.[39]  She replied that she was getting a coat, and Defendant Skero told her not to "be digging in [her]

---

[33]     See Doc. 49-17, Ex. 11-A to Def. Skero's Brief in Support of Summ. J., Def. Skero's Dash Cam Video Recording.

[34]     See id.; Doc. 49-18, Ex. 12 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Skero's Dash Cam Video Recording p. 4.

[35]     Doc. 49-18, Ex. 12 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Skero's Dash Cam Video Recording p. 4.

[36]     See id.; Doc. 49-17, Ex. 11-A to Def. Skero's Brief in Support of Summ. J., Def. Skero's Dash Cam Video Recording.

[37]     See Doc. 49-17, Ex. 11-A to Def. Skero's Brief in Support of Summ. J., Def. Skero's Dash Cam Video Recording.

[38]     See id.

[39]     See id.; Doc. 49-18, Ex. 12 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Skero's Dash Cam Video Recording p. 4.

car."[40]   Defendant Skero returned to his patrol unit, and, within a matter of a few seconds, Plaintiff walked toward the front of her car.[41]   Defendant Skero again told Plaintiff, "Ma'am you need to get to the back of your vehicle like I asked you to."[42]

While speaking on the radio, Defendant Skero described Plaintiff as "off."[43]   He said that she would not "listen to a damn thing" he was saying.[44]   He reported that Plaintiff denied hitting the wall and that he had observed her "swerving everywhere."[45]   Defendant Skero also indicated that he thought she might be taking "pills of some kind."[46]

Defendant Skero returned and questioned Plaintiff about

---

[40]   Doc. 49-17, Ex. 11-A to Def. Skero's Brief in Support of Summ. J., Def. Skero's Dash Cam Video Recording; Doc. 49-18, Ex. 12 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Skero's Dash Cam Video Recording p. 4.

[41]   See Doc. 49-17, Ex. 11-A to Def. Skero's Brief in Support of Summ. J., Def. Skero's Dash Cam Video Recording; Doc. 49-18, Ex. 12 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Skero's Dash Cam Video Recording p. 5.

[42]   Doc. 49-17, Ex. 11-A to Def. Skero's Brief in Support of Summ. J., Def. Skero's Dash Cam Video Recording; Doc. 49-18, Ex. 12 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Skero's Dash Cam Video Recording p. 5.

[43]   Doc. 49-17, Ex. 11-A to Def. Skero's Brief in Support of Summ. J., Def. Skero's Dash Cam Video Recording; Doc. 49-18, Ex. 12 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Skero's Dash Cam Video Recording p. 5.

[44]   Doc. 49-17, Ex. 11-A to Def. Skero's Brief in Support of Summ. J., Def. Skero's Dash Cam Video Recording; Doc. 49-18, Ex. 12 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Skero's Dash Cam Video Recording p. 5.

[45]   Doc. 49-17, Ex. 11-A to Def. Skero's Brief in Support of Summ. J., Def. Skero's Dash Cam Video Recording; Doc. 49-18, Ex. 12 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Skero's Dash Cam Video Recording p. 5.

[46]   Doc. 49-17, Ex. 11-A to Def. Skero's Brief in Support of Summ. J., Def. Skero's Dash Cam Video Recording; Doc. 49-18, Ex. 12 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Skero's Dash Cam Video Recording p. 4.

medications that were prescribed after her back surgery.[47]

**Skero:**     [20:20] Okay, stand over here for me.  Did you just have that surgery and stuff when?

**Goldman:**  January 20.

**Skero:**     January 20.  They didn't prescribe you any medication or anything, pain pills or anything?

**Goldman:**  Sure they did.

**Skero:**     Okay.  You told me they didn't.  You told me you don't take them.

**Goldman:**  I said I don't take them.

**Skero:**     So they prescribed them, but you don't take them?

**Goldman:**  That's right.

**Skero:**     Okay so you haven't taken anything today? At all?

**Goldman:**  Uh, about 8 o'clock this morning.

**Skero:**     What did you take?

**Goldman:**  I took a pain pill.

**Skero:**     Okay, you just told me you don't take pain pills.

**Goldman:**  [Inaudible 20:54] Are you going to arrest me. [Inaudible] I can't bear it—I can't—

**Skero:**     Well what is it?  You're telling me you don't take pain pills.  Now you['re] telling m[e] you took one at 8 o'clock this morning.

**Goldman:**  Well from 8 o'clock to 2 o'clock that's my regular—

---

[47]     See Doc. 49-17, Ex. 11-A to Def. Skero's Brief in Support of Summ. J., Def. Skero's Dash Cam Video Recording; Doc. 49-18, Ex. 12 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Skero's Dash Cam Video Recording p. 6.

**Skero:**     But you just told me you don't take them.

**Goldman:**   I take them in the morning, one.  I take the
one pill for pain, the thyroid, a[n] anti-depressant and,
uh, an antibiotic.[48]

Defendant Skero instructed Plaintiff on the Horizontal Gaze

Nystagmus ("HGN") test, a sobriety field test that asks a suspect

to follow the officer's finger with her eyes without moving her

head.[49]  Plaintiff indicated that she understood the instructions

but, according to the statements Defendant Skero made to Plaintiff

at the time, was not following instructions.[50]

Defendant Skero threatened Plaintiff that, if she did not

follow his instructions, his "only alternative [was] to take [her]

to jail, take the dog to the pound . . . and impound [Plaintiff's]

car."[51]  Plaintiff argued, "Look, I lost my mother, she's eighty-

nine years old, she's dying.  I am very ill.  I have two stents in

my heart.  I have diabetes.  I had surgery here last month.  I have

---

[48]     See Doc. 49-17, Ex. 11-A to Def. Skero's Brief in Support of Summ.
J., Def. Skero's Dash Cam Video Recording; Doc. 49-18, Ex. 12 to Def. Skero's
Brief in Support of Summ. J., Tr. of Def. Skero's Dash Cam Video Recording pp.
5-6.

[49]     See Doc. 49-17, Ex. 11-A to Def. Skero's Brief in Support of Summ.
J., Def. Skero's Dash Cam Video Recording; Doc. 49-18, Ex. 12 to Def. Skero's
Brief in Support of Summ. J., Tr. of Def. Skero's Dash Cam Video Recording p. 7.

[50]     See Doc. 49-17, Ex. 11-A to Def. Skero's Brief in Support of Summ.
J., Def. Skero's Dash Cam Video Recording; Doc. 49-18, Ex. 12 to Def. Skero's
Brief in Support of Summ. J., Tr. of Def. Skero's Dash Cam Video Recording p. 7.

[51]     See Doc. 49-17, Ex. 11-A to Def. Skero's Brief in Support of Summ.
J., Def. Skero's Dash Cam Video Recording; Doc. 49-18, Ex. 12 to Def. Skero's
Brief in Support of Summ. J., Tr. of Def. Skero's Dash Cam Video Recording p. 7.

surgery in my lower back last month."[52]  Plaintiff later stated that she told Defendant Skero that she was unable to complete the HGN test fully "solely" because of her recent back surgery.[53]

Defendant Williams, a state trooper, first became involved about 3:00 p.m. when he heard a call over the radio to locate the black Toyota Prius traveling northbound on I-45.[54]  Dispatch advised him that a 911 caller had reported that the Prius had struck a construction barrier.[55]  Defendant Williams notified dispatch that he was en route.[56]

When he arrived at the scene, Defendant Williams conferred with Defendant Skero about what he had observed.[57]  Defendant Skero told Defendant Williams that Plaintiff would not follow his finger during the HGN test and, instead, just stared at him.[58]  He also

---

[52]    See Doc. 49-17, Ex. 11-A to Def. Skero's Brief in Support of Summ. J., Def. Skero's Dash Cam Video Recording; Doc. 49-18, Ex. 12 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Skero's Dash Cam Video Recording p. 7.

[53]    Doc. 57-1, Aff. of Pl. Dated Sept. 11, 2014 ¶ 11; Doc. 74-1, Revised Aff. of Pl. Dated Oct. 7, 2014 ¶ 11.

[54]    See Doc. 49-4, Ex. 3-A to Def. Skero's Brief in Support of Summ. J., DWI Case Report, Probable Cause Statement & Supplement pp. 4, 13.

[55]    See id. p. 4.

[56]    See id.

[57]    See id.; Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording p. 1.

[58]    See Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording p. 1; Doc. 49-17, Ex. 11-A to Def. Skero's Brief in Support of Summ. J., Def. Skero's Dash Cam Video Recording; Doc. 49-18, Ex. 12 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Skero's Dash Cam Video Recording p. 7.

reported to Defendant Williams that Plaintiff initially denied taking pain pills but later stated that she last took one at eight o'clock that morning.[59]

When Defendant Williams spoke with Plaintiff, she "immediately told [him] that the damage had occurred previously in Houston."[60] Defendant Williams informed Plaintiff that a witness, who called 911, reported that Plaintiff hit a wall near Willis.[61]   To that, Plaintiff responded, "Barely."[62]   The conversation continued:

**Williams:** Barely?

**Goldman:** Yeah.

**Williams:** Yeah, but you did hit the wall?

**Goldman:** I looked down for a minute.

. . . .

**Williams:** [Inaudible 01:51] well Officer Skero told me on

---

[59]   See Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording p. 1; Doc. 49-17, Ex. 11-A to Def. Skero's Brief in Support of Summ. J., Def. Skero's Dash Cam Video Recording; Doc. 49-18, Ex. 12 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Skero's Dash Cam Video Recording pp. 7-8.

[60]   Doc. 49-4, Ex. 3-A to Def. Skero's Brief in Support of Summ. J., DWI Case Report, Probable Cause Statement p. 4; see also Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording p. 1.

[61]   See Doc. 49-4, Ex. 3-A to Def. Skero's Brief in Support of Summ. J., DWI Case Report, Probable Cause Statement p. 4; Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording p. 1.

[62]   Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording p. 1.

the phone a little bit ago, he got behind you, he saw you
swerving, and everything.

**Goldman:**  Okay.

**Williams:**  Okay.  Is there any reason for that?

**Goldman:**  You know I was trying to go to the next exit,
call my friends in Dallas, tell them that I'm staying
overnight in a hotel.  I don't feel like driving.[63]

Plaintiff volunteered that her mother was dying.[64]  Plaintiff

also stated that she suffered from Type II Diabetes and Hepatitis

C, that she underwent surgery a month earlier, and needed two new

knees.[65]  When asked what kind of medication she had been

prescribed, Plaintiff did not immediately answer the question,

instead telling Defendant Williams to call her psychiatrist.[66]

Defendant Williams asked Plaintiff again, and she responded, "I

took . . . . I hate [Inaudible] okay?" and then said, "The last

time I took Hydrocodone was 18 months ago . . . ."[67]  Plaintiff

represented to Defendant Williams that the only medication she had

---

[63]     Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def.
Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in
Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording pp. 1-2

[64]     Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def.
Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in
Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording p. 2.

[65]     Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def.
Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in
Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording p. 2.

[66]     Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def.
Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in
Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording p. 2.

[67]     Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def.
Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in
Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording p. 2.

taken that day was for anxiety and that the anti-anxiety medication relaxed her but not "too much."[68]

Defendant Williams asked Plaintiff to "stay right there a minute" and walked all the way around the car to look at the damage on Plaintiff's car.[69]   When he returned to where Plaintiff was standing, he told her that, if the damage happened in a parking lot, her hubcap would not be about to fall off as it was then.[70] Plaintiff walked toward the highway to look at the damage, and Defendant Williams said, "Ma'am stay over here, I don't want you to get hit by a car."[71]   Plaintiff responded, "I don't care." [72] Defendant Williams said, "Ma'am, Ma'am! I do. Step over here, I don't want you to get hit by a car."[73]   He grabbed her arm and

---

[68]    Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording p. 3.

[69]    Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording p. 3.

[70]    Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording p. 3.

[71]    Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording p. 3.

[72]    Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording p. 3.

[73]    Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording p. 3.

pulled her away from the roadway.[74]

Defendant Williams then began the HGN test.[75]  He provided Plaintiff with instructions and asked if she understood.  She replied while pointing to parts of her face, "Okay you also understand that I have Botox here, here, and here.  So my range of motion is being limited."[76]  Plaintiff rocked slightly as she stood facing Defendant Williams during the HGN test.[77]

Defendant Williams attempted the test four times, stopping between attempts to repeat the instruction to follow the tip of his finger.[78]  After the fourth attempt, Defendant Williams said, "If you're not going to cooperate with me, I have no choice but to take you under arrest for driving while intoxicated . . . . because the evidence we have so far, you hitting the wall in Montgomery County there, and then you're driving erratic observed by Officer Skero

---

[74]    See Doc. 49-17, Ex. 11-A to Def. Skero's Brief in Support of Summ. J., Def. Skero's Dash Cam Video Recording.

[75]    Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording pp. 3-4.

[76]    Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording p. 4.

[77]    See Doc. 49-17, Ex. 11-A to Def. Skero's Brief in Support of Summ. J., Def. Skero's Dash Cam Video Recording.

[78]    Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording p. 4.

there, and then you have slurred speech."[79]

Defendant Williams said that he would try it one more time, and Plaintiff asked if he could do it more slowly.[80]   Defendant Williams explained that he was performing the test as trained.[81] After that attempt, he stopped again, and Plaintiff asked what she had done.[82]   Defendant Williams said, "You followed it out and then looked straight ahead.   I told you not to do that.   You need to follow my finger the whole time. . . . This is the last chance I'm giving you."[83]   He began the test and then stopped abruptly, finding that Plaintiff was still not following his instructions.[84]   Based on his training and experience, Defendant Williams decided that Plaintiff "had lost the normal use of her mental and physical

---

[79]     Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording p. 4.

[80]     Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording p. 5.

[81]     Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording p. 5.

[82]     Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording p. 5.

[83]     Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording p. 5.

[84]     See Doc. 49-4, Ex. 3-A to Def. Skero's Brief in Support of Summ. J., DWI Case Report, Probable Cause Statement p. 4; Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording p. 5.

faculties and was intoxicated."[85]

Defendant Williams told Plaintiff to turn around and put her hands behind her back.[86]  Plaintiff asked if she could "request the right to remain silent."[87]  Defendant Williams repeated the order to turn around twice, and, after the second time, Plaintiff said, "I will not."[88]  At that point, as Defendant Williams repeated his order once more, Defendant Skero approached Plaintiff from a few feet away to assist Defendant Williams in handcuffing Plaintiff.[89]

Plaintiff asked about her car, and Defendant Williams said that it was going to be towed.[90]  Plaintiff protested that she could not have it towed because the car contained "over a half million dollars in jewelry in there."[91]  Plaintiff also expressed concern

---

[85]    Doc. 49-4, Ex. 3-A to Def. Skero's Brief in Support of Summ. J., DWI Case Report, Probable Cause Statement p. 4.

[86]    Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording p. 5.

[87]    See Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording p. 5.

[88]    Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording p. 5.

[89]    See Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 57-1, Aff. of Pl. Dated Sept. 11, 2014 ¶ 12; Doc. 74-1, Revised Aff. of Pl. Dated Oct. 7, 2014 ¶ 12.

[90]    See Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording p. 6.

[91]    Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording p. 6.

about her dog, which was in the car.[92]  She said that the dog was "an animal support" for diabetic service and that Plaintiff had a badge and permit for the dog.[93]  When Defendant Williams inquired, Plaintiff explained that the dog was trained to bark and to get help if Plaintiff passed out.[94]  Defendant Williams explained that Plaintiff would not need the dog at the jail because someone would be with Plaintiff constantly.[95]

Plaintiff asked about her purse and her "private stuff," to which Defendant Skero stated that the officers would get everything.[96]  Plaintiff said, "I have $100,000 worth of jewelry in there."[97]

After a brief discussion with Defendant Williams, Defendant Skero called an ambulance to get Plaintiff checked because of her

---

[92]    See Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording p. 6.

[93]    Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording p. 6.

[94]    Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording p. 6.

[95]    See Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording p. 6.

[96]    Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording p. 6.

[97]    Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording p. 6.

medical conditions, particularly diabetes.[98]   Defendant Williams told Plaintiff that they were calling an ambulance to have emergency technicians check out Plaintiff.[99]   Plaintiff protested, saying that she did not need medical attention.[100]   Defendant Williams told her she did not have a choice.[101]

> **Goldman:** Then I'll call my attorney.
>
> **Williams:** Well, you call your attorney.
>
> **Goldman:** Before I will pass or I subject to any test, I want my attorney.
>
> **Williams:** An attorney is not an option at this point right now.
>
> **Goldman:** Why?
>
> . . . .
>
> **Williams:** Because these are field tests.  Your attorneys are not allowed to be present.[102]

---

[98]     Doc. 49-17, Ex. 11-A to Def. Skero's Brief in Support of Summ. J., Def. Skero's Dash Cam Video Recording; Doc. 49-18, Ex. 12 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Skero's Dash Cam Video Recording p. 10; see also Doc. 49-4, Ex. 3-A to Def. Skero's Brief in Support of Summ. J., DWI Case Report, Probable Cause Statement p. 4.

[99]     See Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording p. 7.

[100]     See Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording p. 7.

[101]     See Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording p. 7.

[102]     Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording pp. 5, 7; see also Doc. 57-1, Aff. of Pl. Dated Sept. 11, 2014 ¶ 2; Doc. 74-1, Revised Aff. of Pl. Dated Oct. 7, 2014 ¶ 2.

While waiting for the ambulance to arrive, Plaintiff asked to sit, and the officers allowed her to sit facing out on the front of her car.[103]   Plaintiff asked if anyone in her family had been called.[104]  "I want absolutely no one called in my family," she said.[105] Defendant Skero said, "Okay."[106]  Plaintiff asked if he had called someone, and he told her that he did not have anyone's name or number.[107]

Plaintiff asked for a tissue out of her purse.[108]  Defendant Williams obliged and, as he did, noticed several prescription medication bottles in the purse.[109]   At that time, Defendant

---

[103]    See Doc. 49-4, Ex. 3-A to Def. Skero's Brief in Support of Summ. J., DWI Case Report, Probable Cause Statement p. 4; Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording p. 8.

[104]    See Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording p. 8.

[105]    Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording p. 8.

[106]    Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording p. 8.

[107]    See Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording pp. 8-9.

[108]    See Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording p. 9.

[109]    See Doc. 49-4, Ex. 3-A to Def. Skero's Brief in Support of Summ. J., DWI Case Report, Probable Cause Statement p. 4; Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording p. 9.

Williams retrieved his camera from his patrol unit to photograph Plaintiff's Prius.[110]  The photographs showed damage in the form of whitish scrapes to the Prius' left rear area and in the form of black marks and scrapes to the hubcap of the left rear wheel.[111] Plaintiff told the officers that she hit the wall when she looked down to try to get something out of her purse.[112]

Defendant Williams read Plaintiff her rights, to which Plaintiff responded that she understood them and wished to terminate the interview.[113]  Defendant Williams then conducted a search of Plaintiff's purse after explaining that he had noticed a "bunch of pill bottles" in it.[114]  Plaintiff later claimed the search was without her permission.[115]  As he pulled out each bottle

---

[110]     See Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording p. 9.

[111]     See Doc. 49-5, Ex. 3-B to Def. Skero's Brief in Support of Summ. J., Photographs.

[112]     Doc. 49-17, Ex. 11-A to Def. Skero's Brief in Support of Summ. J., Def. Skero's Dash Cam Video Recording; Doc. 49-18, Ex. 12 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Skero's Dash Cam Video Recording p. 11.

[113]     See Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording p. 9; Doc. 57-1, Aff. of Pl. Dated Sept. 11, 2014 ¶ 4; Doc. 74-1, Revised Aff. of Pl. Dated Oct. 7, 2014 ¶ 4.

[114]     Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording p. 9; see also Doc. 57-1, Aff. of Pl. Dated Sept. 11, 2014 ¶ 4; Doc. 74-1, Revised Aff. of Pl. Dated Oct. 7, 2014 ¶ 4.

[115]     Doc. 57-1, Aff. of Pl. Dated Sept. 11, 2014 ¶ 4; Doc. 74-1, Revised Aff. of Pl. Dated Oct. 7, 2014 ¶ 4.

of medication, he asked Plaintiff what the medication was.[116]
Plaintiff later said that she felt compelled to answer.[117]
Plaintiff's medications included Levothyroxine (substituted for
Synthroid), Dexamethasone substituted for Decadron), Gabapentin
(commonly known as Neurontin), Carisoprodol (substituted for Soma),
Ibuprofen (commonly known as Advil or Motrin), Clonazepam (commonly
known as Klonopin), Hydrocodone-Acetaminophen (substituted for
Norco), Plavix (also known as Clopidogrel), Lorazepam (substituted
for Ativan), Sertraline (substituted for Zoloft),
Methylprednisolone, and Amoxicillin.[118]

Plaintiff answered Defendant Williams' inquiry on her last
dose of Hydrocodone by telling him that she took "them" the prior
day — once.[119]  Defendant Williams noted that there were "a lot less
than 40" in the bottle.[120]  Plaintiff disagreed and added, "I don't

---

[116]    See Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J.,
Def. Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief
in Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording p. 10.

[117]    Doc. 57-1, Aff. of Pl. Dated Sept. 11, 2014 ¶ 4; Doc. 74-1, Revised
Aff. of Pl. Dated Oct. 7, 2014 ¶ 4.

[118]    See Doc. 49-6, Ex. 3-B to Def. Skero's Brief in Support of Summ. J.,
Photographs of Medication; Doc. 49-7, Ex. 3-B to Def. Skero's Brief in Support
of Summ. J., Photographs of Medication; Doc. 49-8, Ex. 3-C to Def. Skero's Brief
in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-9, Ex.
4 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Williams' Dash Cam
Video Recording pp. 9-12.

[119]    Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def.
Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in
Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording p. 10.

[120]    Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def.
Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in
Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording p. 10.

take them because they've already eaten a hole in my stomach after so many years of pain."[121]   During the medication discussion, Plaintiff stated that she did not want her mother or sister called.[122]

The paramedics arrived and were briefed by Defendant Skero.[123] After speaking with Plaintiff and checking her blood sugar, one of the paramedics informed Defendant Williams that Plaintiff's blood sugar reading was normal and that she was oriented to time and place.[124]   Plaintiff volunteered that she had been in the hospital recently for spinal surgery and that she had a torn rotator cuff and two knees that needed to be replaced.[125]   Plaintiff expressed concern to the paramedic who sought her name and contact information that the paramedic would contact Plaintiff's family.[126]

---

[121]    Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording p. 10.

[122]    See Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording p. 10.

[123]    Doc. 49-17, Ex. 11-A to Def. Skero's Brief in Support of Summ. J., Def. Skero's Dash Cam Video Recording; Doc. 49-18, Ex. 12 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Skero's Dash Cam Video Recording p. 14.

[124]    See Doc. 49-4, Ex. 3-A to Def. Skero's Brief in Support of Summ. J., DWI Case Report, Probable Cause Statement p. 4; Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording pp. 12-13.

[125]    Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording pp. 12-14.

[126]    Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording p. 14.

The paramedic indicated that she would not, and Defendant Williams also stated that he would not report anything to her family.[127] About this time, Defendant Skero telephoned the 911 witness and asked him to come back to the scene to provide a statement.[128]

Overhearing a discussion between one of the paramedics and Defendant Williams about having animal control pick up Plaintiff's dog, Plaintiff objected.[129]  Defendant Williams asked Plaintiff if she knew of someone who could pick up the dog for her, and she said that she did not.[130]  Plaintiff became very upset that her dog would be taken to animal control.[131]  This began a three-and-a-half-minute conversation during which Plaintiff pleaded with Defendant Williams to let the dog remain with her or to let her go with the dog, refused to allow her dog to go with animal control, and requested

---

[127]    Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording p. 14.

[128]    Doc. 49-17, Ex. 11-A to Def. Skero's Brief in Support of Summ. J., Def. Skero's Dash Cam Video Recording; Doc. 49-18, Ex. 12 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Skero's Dash Cam Video Recording p. 18.

[129]    Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording p. 16.

[130]    Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording p. 16.

[131]    Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording p. 16.

an attorney.[132]

While this conversation ensued, Defendant Williams asked Plaintiff to stand, but Plaintiff refused to leave her dog.[133] Eventually, Defendant Skero walked over and assisted Defendant Williams in getting Plaintiff out of her car and escorting her to Defendant Williams car.[134]  Plaintiff screamed, "I want my dog!" and "No!" repeatedly and dragged her feet as the officers tried to guide her to Defendant Williams' patrol unit.[135]   Plaintiff complained that Defendant Williams was breaking her arm and that the handcuffs were cutting into her arm.[136]   Plaintiff later described the officers' actions, claiming that Defendant Skero assisted Defendant Williams in "grabbing [her] neck and arms and dragging [her] to Defendant Williams' police car, where they pushed

---

[132]   See Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording pp. 16-19.

[133]   Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording pp. 17-18.

[134]   See Doc. 49-4, Ex. 3-A to Def. Skero's Brief in Support of Summ. J., DWI Case Report, Probable Cause Statement p. 4; Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording pp. 17-18; 49-17, Ex. 11-A to Def. Skero's Brief in Support of Summ. J., Def. Skero's Dash Cam Video Recording.

[135]   See Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording pp. 17-18; Doc. 49-17, Ex. 11-A to Def. Skero's Brief in Support of Summ. J., Def. Skero's Dash Cam Video Recording.

[136]   See Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording pp. 17-18.

[her] into his car."[137]

Defendant Williams buckled Plaintiff into the front passenger seat of his vehicle.[138]  Defendant Williams entered the other side of his patrol unit and sat in the driver's seat.[139]  He turned on a second camera trained on Plaintiff.[140]  Defendant told Plaintiff that she had been arrested for the offense of driving while intoxicated and read Plaintiff a statutory warning about the offense and the taking of a breath and/or a blood sample.[141]  At the end of the information, Defendant Williams stated, "I am now requesting a specimen of your blood."[142]

**Goldman:**  Now?

**Williams:**  I am requesting a specimen of your blood right now.

**Goldman:**  Absolutely not.  You can take an alcohol test, but not a blood test.

---

[137]   Doc. 57-1, Aff. of Pl. Dated Sept. 11, 2014 ¶ 13; Doc. 74-1, Revised Aff. of Pl. Dated Oct. 7, 2014 ¶ 13.

[138]   See Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording p. 20.

[139]   See Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording.

[140]   See id.

[141]   See Doc. 49-4, Ex. 3-A to Def. Skero's Brief in Support of Summ. J., DWI Case Report, Probable Cause Statement p. 4; Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording pp. 20-21.

[142]   Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording p. 21.

**Williams:** Okay.

**Goldman:** Because I have just gotten out of spinal surgery, and I did take a pill last night.[143]

Plaintiff sat in the car while Defendant Williams inventoried the contents of her car.[144]   While alone in the car, Plaintiff repeated, "I want my dog," various curse words, and complaints.[145] After awhile, she pushed the interior camera with her foot so that it was no longer pointing directly at her.[146]   Defendant Williams returned, repositioned the camera, scolded Plaintiff for moving it, and warned her that if she touched it again, he would "strap [her] legs down."[147]

Defendant Williams exited the vehicle and returned several more times while Plaintiff remained in the car.[148]   When Defendant

---

[143]   See Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording p. 21.

[144]   See Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording pp. 22, 25.

[145]   See Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording pp. 24-25, 27.

[146]   See Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording p. 26

[147]   See Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording p. 26.

[148]   See Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording pp. 27-35.

Williams was in the vehicle with her, Plaintiff asked questions about, inter alia, her dog, her property, her glasses, the charge, and any contact with her family.[149]   She also complained about the handcuffs and admitted taking "a pill" an hour and a half prior to the arrest.[150]   When Defendant Williams was not in the car, Plaintiff cried, cursed, and twice more kicked the interior camera.[151]   After the third kick, which dislodged the camera from the windshield, Defendant Williams strapped Plaintiff's legs.[152]

After animal control had taken Plaintiff's dog, the wrecker had taken her car, and the 911 witness had filled out a witness statement, Defendant Williams drove Plaintiff to the Montgomery County jail.[153] Plaintiff continued talking to Defendant Williams about, inter alia, her dog, her property, her medical conditions, and the pain caused by the handcuffs; Defendant Williams responded

---

[149]    See Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording pp. 27-35.

[150]    See Doc. 49-4, Ex. 3-A to Def. Skero's Brief in Support of Summ. J., DWI Case Report, Probable Cause Statement p. 4; Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording pp. 26, 31.

[151]    See Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording pp. 27-35.

[152]    See Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording p. 34.

[153]    See Doc. 49-4, Ex. 3-A to Def. Skero's Brief in Support of Summ. J., DWI Case Report, Probable Cause Supplement p. 13; Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording p. 36.

occasionally.[154]  When they were almost to the jail, Plaintiff asked "So if I make a run for it will you shoot me?"[155]

At the jail, four of Plaintiff's medications were held for Plaintiff but not administered while she was in custody.[156]  The jail medical staff did not restart Carisoprodol because it was a prohibited drug at that facility, Dexamethasone because it was out of date, Methylprednisolone because the prescription could not be verified, and Hydrocodone because it was a narcotic.[157]

In her affidavit, Plaintiff swore that she did not "speed or swerve improperly in and out of lanes on the highway" while driving that day.[158]  She also denied "drink[ing] alcohol at any point in time relevant to this suit" due to her "legal medications and serious medical conditions," including Hepatitis C, and denied that she was otherwise impaired.[159]

Plaintiff stated in the affidavit that, after she was stopped, she was not at any time unsteady on her feet, that she had no

---

[154]    See Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording pp. 36-40.

[155]    See Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-9, Ex. 4 to Def. Skero's Brief in Support of Summ. J., Tr. of Def. Williams' Dash Cam Video Recording p. 40.

[156]    See Doc. 49-20, Ex. 14 to Def. Skero's Brief in Support of Summ. J., Excerpts from Jail Med. Recs.

[157]    See id.

[158]    Doc. 57-1, Aff. of Pl. Dated Sept. 11, 2014 ¶ 6; Doc. 74-1, Revised Aff. of Pl. Dated Oct. 7, 2014 ¶ 6.

[159]    Id. ¶¶ 5, 10.

trouble standing, walking, or talking, that she was fully alert, and that she respectfully cooperated with Defendants Skero and Williams throughout the process.[160]   She admitted that she was walking with a limp as a result of recent back surgery.[161]

In her deposition, Plaintiff admitted that she did swerve "[v]ery, very little" while driving on February 26, 2012.[162]   She also admitted that, while she was driving on that day prior to her arrest, "[t]he rear tire cover scraped the barricade that was right up to the yellow line" and that she was aware at the time that she had hit something.[163]

Defendant Skero stated, in a declaration, that he found his observation of Plaintiff swerving and the "fresh damage" on her car to provide corroboration for the 911 witness's account.[164] Defendant Skero also stated that Defendant Williams made the decision to take Plaintiff into custody.[165]   In a statement made part of the case report, Defendant Skero said that he observed Plaintiff being unsteady on her feet, nearly losing her balance and almost falling several times, that Plaintiff appeared to be

---

[160]   Id. ¶¶ 7-8.

[161]   Id. ¶ 14.

[162]   Doc. 93-1, Ex. A to Pl.'s App. in Support of Pl.'s Resp. to Def. Skero's Supplement to Mot. for Summ. J., Dep. of Pl. p. 22.

[163]   See id.

[164]   Doc. 49-12, Ex. 7 to Def. Skero's Brief in Support of Summ. J., Decl. of Def. Skero ¶¶ 3, 4.

[165]   Id. ¶ 7.

lethargic and disoriented, and that she slurred her speech and did not follow commands.[166]

Defendant Williams charged Plaintiff with the offense of Driving While Intoxicated.[167]   Defendant Williams recorded on the case report that Plaintiff did not consent to a search and that a search was not conducted, only an inventory of Plaintiff's vehicle.[168]   He also noted that speed was not a factor for the stop and that Plaintiff's resistance was passive.[169]

Defendant Williams recorded in the statement of probable cause information about Defendant Skero's actions and observations prior to Defendant Williams' arrival.[170]   According to Defendant Williams' case report, Skero observed Plaintiff swerving and crossing over the dividing lines, being unsteady on her feet, almost falling several times, slurring her speech, appearing lethargic, not following directions, and not following commands during the field sobriety tests.[171]   The report also noted that Plaintiff told Defendant Skero that she did not hit a wall and that the damage to

---

[166]   <u>See</u> Doc. 49-4, Ex. 3-A to Def. Skero's Brief in Support of Summ. J., DWI Case Report p. 15.

[167]   <u>See</u> Doc. 49-4, Ex. 3-A to Def. Skero's Brief in Support of Summ. J., DWI Case Report p. 1.

[168]   <u>See</u> <u>id.</u>

[169]   <u>See</u> <u>id.</u> p. 2.

[170]   <u>See</u> <u>id.</u> p. 4.

[171]   <u>See</u> <u>id.</u>

her car was old.[172]   Defendant Williams "observed several signs of
intoxication including: driving habits as witnessed by Officer
Skero, swaying while standing, and [] slurred speech."[173]

### 2.  Plaintiff's Allegations Concerning Her Time in Jail[174]

At the Montgomery County jail, Plaintiff was strip searched
and given a uniform to wear.[175]  She was "taken to an extremely cold
room, where she was tied down."[176]  Later, she was taken to "another
extremely cold room, where she hid under a metal slab in an attempt
to seek protection from the vents blowing cold air."[177]  Her third
stop was "a room in the solitary division" of the jail, where she
was held for four days.[178]  In the "special solitary unit, . . .
there were windows in the bathroom through which male employees
could watch her."[179]

For the entire time that Plaintiff was in custody, she was not
allowed to lie down from 6:30 a.m. to 9:30 p.m. or to rest against

---

[172]   See id.

[173]   Id. pp. 4, 13.

[174]   The facts recounted in this section are relevant only to the pending
motion to dismiss; therefore, the court drew the information entirely from
Plaintiff's Second Amended Complaint.  The court denies Defendant Montgomery
County's request for the court to take judicial notice of the jail records.
Plaintiff alleged a very different version of what occurred while she was in
jail.

[175]   Doc. 39, Pl.'s 2nd Am. Compl. p. 7.

[176]   Id.

[177]   Id. pp. 7-8.

[178]   Id. p. 8.

[179]   Id.

a wall.[180]  "If [Plaintiff] sat down, her feet were required to be planted on the ground and her hands in her lap."[181]

Plaintiff was never provided with a toothbrush, toothpaste, or a towel and was not given a blanket until her second day of incarceration.[182]  Staff directed anti-Semitic remarks to Plaintiff and placed her in a cell with a swastika and "SS" carved into the wall.[183]

Plaintiff was not allowed to continue taking any of her prescription medications, including insulin, and her medical braces were taken away.[184]  She was unable to "eat the majority of the food offered to her" in the absence of insulin, and her requests for special dietary meals were ignored.[185]

Staff at the jail withheld her cell phone, which she need to retrieve telephone numbers of those individuals who could assist her with bail, and failed to inform her of payment options for securing bail.[186]  Jail staff took cash from Plaintiff's purse purportedly for dental work, but Plaintiff received no dental

---

[180]   Id.

[181]   Id.

[182]   Id. p. 8.

[183]   Id. p. 9.

[184]   Id. pp. 7, 8.

[185]   Id. p. 9.

[186]   Id. p. 8.

33

treatment while in custody.[187]   After five days, Plaintiff was able to secure money for the payment of the $1,500 bail.[188]   Plaintiff's court date was set for May 23, 2012.[189]   The charge against Plaintiff was ultimately dismissed in August 2013 "in the interest of justice."[190]

**B.   <u>Procedural Background</u>**

On February 21, 2014, Plaintiff filed this action against Defendants Williams, Skero, and Montgomery County, alleging false arrest/false imprisonment in violation of the Fourth Amendment pursuant to 42 U.S.C. 1983 ("Section 1983") and malicious prosecution pursuant to Texas Civil Practice and Remedies Code § 41.003.[191]   Before any defendant's answer was due, Plaintiff filed an amended complaint in which she added claims for intentional infliction of emotional distress against all defendants and negligence against Defendant Montgomery County.[192]   Plaintiff also included a claim that Defendant Montgomery County violated her due process rights as a result of a policy, practice, and/or pattern.[193]

---

[187]   See <u>id.</u> p. 9.

[188]   See <u>id.</u>  Plaintiff stated in her deposition that her mother paid the bail for her.  <u>See</u> Doc. 93-1, Ex. A to Pl.'s App. in Support of Pl.'s Resp. to Def. Skero's Supplement to Mot. for Summ. J., Dep. of Pl. p. 113.

[189]   See Doc. 39, Pl.'s 2nd Am. Compl. p. 10.

[190]   <u>Id.</u> (alterations omitted).

[191]   See Doc. 1, Pl.'s Original Compl.

[192]   See Doc. 10, Pl.'s 1st Am. Compl.

[193]   See <u>id.</u> p. 11.

On May 5, 2014, Defendant Williams answered and raised qualified, official, and statutory immunity.[194]  Defendant Skero filed a motion to dismiss on that same day and, three days later, filed a motion for judgment on the pleadings.[195]  On May 12, 2014, Defendant Montgomery County filed a motion to dismiss.[196]  Shortly after these pleadings were filed, the case was referred to the undersigned.[197]

After the briefing was complete on Defendants' dispositive motions, Plaintiff filed a motion for leave to file a second amended complaint, which the court granted.[198]  The court also mooted Defendants' dispositive motions, instructing them to refile their Federal Rule of Civil Procedure ("Rule") 12 motions to address any pleading deficiencies in the second amended complaint.[199]

In Plaintiff's second amended complaint, she pled the following constitutional violations pursuant to Section 1983: (1)

---

[194]    See Doc. 12, Def. William's Answer.

[195]    See Doc. 14, Def. Skero's Mot. to Dismiss; Doc. 16, Mot. for J. on the Pleadings.

[196]    See Doc. 17, Def. Montgomery County's Mot. to Dismiss.

[197]    See Doc. 33, Order Dated May 15, 2014.

[198]    See Doc. 35, Pl.'s Opposed Mot. for Leave to File a 2nd Am. Compl.; Doc. 38, Order Dated July 10, 2014.

[199]    See Doc. 38, Order Dated July 10, 2014.

use of excessive force in violation of the Eighth Amendment[200] against Defendants Williams and Montgomery County; (2) unlawful search and seizure in violation of the Fourth Amendment against Defendant Williams; (3) false arrest/false imprisonment[201] in violation of the Fourth Amendment against Defendants Skero, Williams, and Montgomery County; (4) failure to provide medical care and treatment in violation of the Eighth Amendment[202] against Defendant Montgomery County; and (5) due process violations[203] under

---

[200]   Excessive force claims based on the force used during an arrest fall under the Fourth Amendment. See, e.g., Valencia v. Wiggins, 981 F.2d 1440, 1444 (5th Cir. 1993). Post arrest, pretrial detainees are protected by the Due Process Clause of the Fourteenth Amendment. See Kitchen v. Dallas Cnty., Tex., 759 F.3d 468, 477 (5th Cir. 2014)(ultimately applying the same analysis as a convicted prisoner's excessive force claim pursuant to the Eighth Amendment). The court, therefore, evaluates Plaintiff's excessive force allegations under the applicable constitutional amendment.

[201]   Plaintiff pled false arrest and false imprisonment as two separate claims. The United States Supreme Court once noted that false arrest and false imprisonment overlap, the former being a species of the latter, and, for purposes of that case, considered the two constitutional torts together. See Wallace v. Kato, 549 U.S. 384, 388-89 (2007). The Fifth Circuit has determined that both false arrest and false imprisonment "require a showing of no probable cause." Brown v. Lyford, 243 F.3d 185, 189 (5th Cir. 2001); see also Haggerty v. Tex. S. Univ., 391 F.3d 653, 655-56 (5th Cir. 2004). Because both claims rely on the absence of the same pre-arrest probable cause finding, the court analyzes these claims together.

[202]   Pretrial detainees enjoy the same rights as convicted prisoners to "constitutional essentials like medical care and safety," but that right emanates from the Fourteenth Amendment's due process guarantees, rather than the Eighth Amendment's protection against cruel and unusual punishment. Jacobs v. W. Feliciana Sheriff's Dep't, 228 F.3d 388, 393 (5th Cir. 2000). The court, therefore considers Plaintiff's allegations against Defendant County for failure to provide medical care as if pled as a Fourteenth Amendment claim.

[203]   In the section headed "Governmental Entity Liability," Plaintiff's live pleading stated, "Defendant Montgomery County negligently destroyed and/or discarded videotape evidence of wrongful conduct and mistreatment of Plaintiff while she was incarcerated in violation of her due process rights." Doc. 39, Pl.'s 2nd Am. Compl. p. 21. Reading the complaint broadly, the court considers this to allege a due process violation.

the Fourteenth Amendment against Defendant Montgomery County.[204]
Plaintiff reasserted her claim that Defendant Montgomery County
violated her due process rights as a result of a policy, practice,
and/or pattern.[205]

Plaintiff also alleged the following state law causes of
action: (1) malicious prosecution against Defendants Skero and
Williams; (2) intentional infliction of emotional distress against
Defendants Skero and Williams; (3) defamation against Defendants
Skero and Williams; and (4) negligence against Defendants Williams

---

[204]   See Doc. 39, Pl.'s 2nd Am. Compl. pp. 11-16.  In later briefing,
Plaintiff claims that all three defendants violated her right to equal protection
of the laws.  See Doc. 57, Pl.'s Resp. to Def. Skero's Mot. for Summ. J. p. 12;
Pl.'s Resp. to Def. Williams' Mot. for Summ. J. p. 10.  In order to state a claim
under the Equal Protection Clause of the Fourteenth Amendment, a plaintiff first
must allege "that two or more classifications of similarly situated persons were
treated differently" by a state actor.  Gallegos-Hernandez v. United States, 688
F.3d 190, 195 (5th Cir. 2012).  The words "equal protection" are not in her
second amended complaint at all, and nothing therein suggests that she was
treated differently from similarly situated persons of another classification.
Although she identified herself as Jewish in her complaint and stated that she
had felt persecuted while detained in the jail, Plaintiff stopped short of
claiming that characteristic as a classification subject to a heightened standard
of review or claiming that the jail staff distinguished between Jews and non-Jews
in their treatment of prisoners.  See Doc. 39, Pl.'s 2nd Am. Compl.  Therefore,
the claim is not properly before the court, and the court does not address it in
this memorandum.

[205]   See Doc. 39, Pl.'s 2nd Am. Compl. p. 21.  In later briefing,
Plaintiff claims that Defendants Skero and Williams violated her due process
rights.  See Doc. 57, Pl.'s Resp. to Def. Skero's Mot. for Summ. J. p. 12; Pl.'s
Resp. to Def. Williams' Mot. for Summ. J. p. 10. Other than in her general
assertion of a due process violation in the "Nature of the Action" section, the
only defendant other than Defendant Montgomery County whom Plaintiff accused of
violating her due process rights was Defendant Williams in the context of an
allegation of an illegal search and seizure under the Fourth Amendment.  See Doc.
39, Pl.'s 2nd Am. Compl. p. 12.  There, Plaintiff did not state any facts to
support a due process violation separate from the right to be free from
unreasonable searches and seizures.  See id.
Reading Plaintiff's second amended complaint as broadly as possible, the
only due process violation alleged in her complaint was against Defendant
Montgomery County related to the destruction of the jail video recordings.  See
id.  Therefore, the court does not address any other due process claim raised by
Plaintiff in later briefing.

and Montgomery County.[206]   Plaintiff further sought declarations that Defendants violated her "federal and state Constitutional rights" and that any future actions of a similar nature "based upon the same circumstances would violate her federal and state Constitutional Rights."[207]   As relief for all of her causes of action, Plaintiff requested compensatory damages, punitive damages, declaratory relief, costs, and fees.[208]

On July 21, 2014, Defendant Skero filed an answer to Plaintiff's second amended complaint, raising the defenses of qualified immunity, election of remedies, official immunity, probable cause, statute of limitations, consent, and preexisting injuries.[209]   He also challenged Plaintiff's request for punitive damages as violative of the Due Process Clause of the U.S. Constitution.[210]

On July 25, 2014, Defendant Montgomery County filed a motion to dismiss Plaintiff's second amended complaint.[211]   On the same date, Defendant Williams filed an answer to Plaintiff's second amended complaint, raising defenses of qualified, official, and

---

[206]   See Doc. 39, Pl.'s 2nd Am. Compl. pp. 16–21.

[207]   Id. p. 22.

[208]   Id. p. 24.

[209]   See Doc. 40, Def. Skero's Answer to Pl.'s 2nd Am. Compl. pp. 1, 10–13.

[210]   See id. p. 13.

[211]   See Doc. 41, Def. Montgomery County's Mot. to Dismiss Pl.'s 2nd Am. Compl.

statutory immunity.[212]

On August 21, 2014, Defendant Skero filed a motion for summary judgment on all of the claims asserted against him.[213]   Defendant Skero also filed a motion to stay or limit discovery pending the court's ruling on his motion for summary judgment.[214]   On September 8, 2014, the court granted Defendant Skero's motion and stayed discovery in the case.[215]   Plaintiff responded timely to Defendant Skero's summary judgment motion.[216]

On September 12, 2014, Defendant Williams filed a motion for summary judgment on all of the claims asserted against him.[217] Defendant Williams filed a motion requesting a protective order staying all discovery pending the court's resolution of his motion for summary judgment.[218]

On September 18, 2014, Defendant Skero filed a motion for Rule 11 sanctions based on Plaintiff's omission of facts from her second amended complaint that Defendant Skero contended were fatal to her

---

[212]   See Doc. 43, Def. Williams' Answer to Pl.'s 2nd Am. Compl.

[213]   See Doc. 48, Def. Skero's Mot. for Summ. J.

[214]   See Doc. 50, Def. Skero's Mot. to Stay Disc. or, Alternatively, for Limited Disc. Pending Ruling on Immunity.

[215]   See Doc. 54, Order Dated Sept. 8, 2014.

[216]   See Doc. 57, Pl.'s Resp. to Def. Skero's Mot. for Summ. J.

[217]   See Doc. 59, Def. Williams' Mot. for Summ. J.

[218]   See Doc. 60, Def. Williams' Opposed Motion for Protective Order.

claims against him.[219]  Plaintiff had removed the admission that Defendant Skero was acting within his general scope of duties at all times and the allegation that Defendant Skero stopped Plaintiff's vehicle in reliance on a dispatcher's report that a witness had reported that Goldman was speeding and swerving.[220] After Plaintiff responded and the court set a hearing, Defendant Skero withdrew the motion because he had not complied with Rule 11's safe harbor provision.[221]

On September 26, 2014, Plaintiff filed a notice of dismissal of the intentional infliction of emotional distress claim against all Defendants, the defamation claim against all Defendants, and the negligence claim[222] against Defendant Montgomery County.[223]  The court entered an order dismissing those claims.[224]

On October 17, 2014, the court held a hearing on several

---

[219]   See Doc. 62, Def. Skero's Mot. for Sanctions.

[220]   Id. p. 2.

[221]   See Doc. 73, Notice of Withdrawal of Mot. for Sanctions Without Prejudice.

[222]   Plaintiff listed a "premises liability" claim as one being dismissed. See Doc. 63, Notice of Partial Dismissal of State Law Cls. Dated Sept. 26, 2014. Plaintiff did not plead a premises liability claim; however, she did assert a negligence claim for premises defects against Defendant Montgomery County. See Doc. 39, Pl.'s 2nd Am. Compl.  The court understands Plaintiff's notice to indicate that she intended to drop the negligence claim based only on premises defects.  Nothing in Plaintiff's notice indicated that she was dismissing her negligence claim against Defendant Williams for his use of handcuffs or against Defendant Montgomery County for condition or use of tangible personal property. See Doc. 63, Notice of Partial Dismissal of State Law Cls. Dated Sept. 26, 2014.

[223]   See Doc. 63, Pl.'s Notice of Partial Dismissal of State Law Cls. Dated Sept. 26, 2014.

[224]   See Doc. 64, Order Dated Sept. 29, 2014.

pending motions.[225]  The court lifted the stay of discovery to allow limited discovery on issues related to the pending motions for summary judgment.[226]  The court mooted Def. Williams' motion for a protective order.[227]

On November 7, 2014, Defendant Skero renewed his motion for sanctions on identical grounds.[228]  After Plaintiff responded and the court set a hearing, Defendant Skero withdrew his motion.[229]  On December 19, 2014, both Defendants Skero and Williams filed supplements to their motions for summary judgment.[230]

On December 30, 2014, Plaintiff filed a notice of dismissal of her malicious prosecution claim and her declaratory judgment request.[231]  The court entered an order dismissing those claims.[232]

On February 3, 2015, Defendants Skero and Williams filed a motion for sanctions.[233]  Therein, they asked the court to strike

---

[225]   See Doc. 76, Min. Entry Dated Oct. 17, 2014.

[226]   See id.

[227]   See id.

[228]   See Doc. 77, Def. Skero's Renewed Mot. for Sanctions.

[229]   See Doc. 89, Def. Skero's Withdrawal of Renewed Mot. for Sanctions.

[230]   See Doc. 85, Def. Williams' Supplemental Mot. for Summ. J.; Doc. 86, Def. Skero's Supplemental Mot. for Summ. J.

[231]   See Doc. 91, Pl.'s Notice of Partial Dismissal of State Law Cls. Dated Dec. 30, 2014.

[232]   See Doc. 98, Order Dated Jan. 8, 2015.

[233]   See Doc. 99, Def. Skero & Williams' Mot. for Sanctions.

41

Plaintiff's deposition errata sheet.[234]   The court granted the motion.[235]

The pending dispositive motions are fully briefed and ready for the court's consideration.

## II. Section 1983

A plaintiff can establish a prima facie case under Section 1983[236] for the deprivation of civil rights by establishing: (1) a violation of a federal constitutional or statutory right; and (2) that the violation was committed by an individual acting under the color of state law.  Doe v. Rains Cnty. Indep. Sch. Dist., 66 F.3d 1402, 1406 (5th Cir. 1995).  The statute creates no substantive rights but only provides remedies for deprivations of rights created under federal law.  Graham v. Connor, 490 U.S. 386, 393-94 (1989).

Plaintiff's lawsuit raises the constitutional rights of Fourth Amendment protection against excessive force, unlawful search and seizure, and false arrest/false imprisonment based on events prior

---

[234]   See id. p. 1

[235]   See Doc. 102, Order Dated Feb. 27, 2015.

[236]   The provision reads, in relevant part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.

to and during the arrest and of Fourteenth Amendment protection against excessive force, failure to provide medical care, and due process violations for events during her detention at the Montgomery County jail.

## A.  <u>Fourth Amendment Standards</u>

The Fourth Amendment,[237] applied to state actors through the Fourteenth Amendment, protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.  All of Plaintiff's Fourth Amendment claims fit within this portion of the Fourth Amendment.

In order to establish an excessive force claim, a plaintiff must show: (1) an injury; (2) that resulted directly from the use of force that was excessive; and (3) the force used was unreasonable.  <u>Carnaby v. City of Houston</u>, 636 F.3d 183, 187 (5th Cir. 2011)(citing <u>Freeman v. Gore</u>, 483 F.3d 404, 416 (5th Cir. 2007).  The plaintiff's resulting injury need not be significant but must be more than de minimis.  <u>Glenn v. City of Tyler</u>, 242 F.3d 307, 314 (5th Cir. 2001).  The particular context must be examined to determine whether the officer acted reasonably in terms

---

[237]    The full text of the Fourth Amendment is:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

of the amount of force deployed.  <u>Id.</u>  Reasonableness swings in the balance of the degree of intrusion on the individual's constitutional rights, as measured by the amount of force used, and the importance to the government of apprehending the individual. See <u>Graham</u>, 490 U.S. at 396; <u>Ikerd v. Blair</u>, 101 F.3d 430, 434 (5th Cir. 1996).

Factors such as the following are pertinent to the inquiry: 1) whether the suspect was armed; 2) whether the suspect posed an immediate threat to the safety of the officers or the public; 3) whether the suspect resisted arrest; 4) whether a warrant was employed and the severity of the crime for which the suspect was to be arrested; 5) whether more than one suspect or police officer was involved; and 6) whether other dangerous or exigent circumstances existed at the time of arrest.  See <u>Graham</u>, 490 U.S. at 396; <u>Tennessee v. Garner</u>, 471 U.S. 1, 11 (1985); <u>Brown v. Glossip</u>, 878 F.2d 871, 874 (5th Cir. 1989).

The Fourth Amendment generally requires police to secure a warrant before conducting a search.  <u>Maryland v. Dyson</u>, 527 U.S. 465, 466 (1999).  However, there is an exception in the context of vehicles, when a search may be justified by probable cause.  <u>Id.</u> at 466-67.

Claims of false arrest and false imprisonment both rely on the absence of probable cause.  <u>Haggerty v. Tex. S. Univ.</u>, 391 F.3d 653, 655-56 (5th Cir. 2004); <u>Brown v. Lyford</u>, 243 F.3d 185, 189 (5th

Cir. 2001).  A warrantless arrest must be supported by "probable cause to believe that a criminal offense has been or is being committed." <u>Devenpeck v. Alford</u>, 543 U.S. 146, 152 (2004).  The standard for the existence of probable cause is an objective one requiring that the officer draw a reasonable conclusion from the facts available to him at the time of the arrest.  <u>Id.</u>; <u>see also</u> <u>Blackwell v. Barton</u>, 34 F.3d 298, 303 (5th Cir. 1994)(stating that probable cause exists if a reasonable person, based on the facts available at the time, would believe that an offense has been committed and that the individual being arrested is the guilty party).

A temporary traffic stop also constitutes a seizure within the meaning of the Fourth Amendment and must meet the constitutional imperative that it be reasonable.  <u>Whren v. United States</u>, 517 U.S. 806, 809-10 (1996).  However, for investigative stops, the Fourth Amendment only requires that a police officer have reasonable suspicion, a standard "obviously less" than probable cause.  <u>Prado Navarette v. Cal.</u>, _____ U.S. _____, 134 S. Ct. 1683, 1687 (2014)(quoting <u>United States v. Sokolow</u>, 490 U.S. 1, 7 (1989)). "Reasonable suspicion exists when the detaining officer can point to specific and articulable facts that, when taken together with rational inferences from those facts, reasonably warrant the search and seizure." <u>U.S. v. Estrada</u>, 459 F.3d 627, 631 (5th Cir. 2006). In other words, investigative stops are constitutional when based

on "a particularized and objective basis for suspecting the particular person stopped of criminal activity." Prado Navarette, 134 S. Ct. at 1687 (quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981)).  The analysis of whether an officer had reasonable suspicion considers "both the content of information possessed by police and its degree of reliability." Id. (quoting Alabama v. White, 496 U.S. 325, 330 (1990)).  The court should consider "the totality of the circumstances confronting [the] police officer, including all information available to the officer at the time of the decision to stop a person." Goodson v. City of Corpus Christi, 202 F.3d 730, 736 (5th Cir. 2000)(quoting United States v. Silva, 957 F.2d 157, 160 (5th Cir. 1992)); see also Prado Navarette, 134 S. Ct. at 1687.

## B.  **Fourteenth Amendment Standards**

In addition to making other constitutional protections applicable to state actors, the Fourteenth Amendment[238] prohibits state actors from depriving individuals of "life, liberty, or property, without due process of law." U.S. Const. amend. XIV. All of Plaintiff's Fourteenth Amendment claims fit within this

---

[238]   The full text of the first section of the Fourteenth Amendment is:

All persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside.  No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

46

portion of the Fourteenth Amendment.

Arrestees and pretrial detainees have a Fourteenth Amendment due process right to "be secure in [their] basic human needs, such as medical care and safety." Hare v. City of Corinth, Miss., 74 F.3d 633, 647-48 (5th Cir. 1996); see also United States v. Gonzales, 436 F.3d 560, 573 (5th Cir. 2006).  This includes the right to be free of excessive force and to be provided medical care.  Kitchen v. Dallas Cnty., Tex., 759 F.3d 468, 477 (5th Cir. 2014)(discussing a Fourteenth Amendment claim of excessive force); Jacobs v. W. Feliciana Sheriff's Dep't, 228 F.3d 388, 393 (5th Cir. 2000)(discussing a Fourteenth Amendment claim of failure to provide medical care).

Regarding the use of force, a violation occurs when the force is used "maliciously and sadistically for the very purpose of causing harm to the pretrial detainee, rather than in a good faith effort to maintain or restore discipline." Kitchen, 759 F.3d at 477 (quoting United States v. Daniels, 281 F.3d 168, 179 n.10 (5th Cir. 2002), and Valencia v. Wiggins, 981 F.2d 1440, 1446 (5th Cir. 1993))(internal quotations marks omitted).  With regard to medical care, a state official's "episodic act or omission"[239] violates that right if the official acts or fails to act with subjective deliberate indifference to a detainee's needs.  Jacobs, 228 F.3d at

---

[239]    A different standard for evaluation is used in conditions of confinement cases.  See Hare, 74 F.3d at 644-45.

393 (quoting <u>Nerren v. Livingston Police Dep't</u>, 86 F.3d 469, 473
(5th Cir. 1996)).  "To be actionable, the detention officer['s]
conduct must demonstrate subjective awareness of a substantial risk
of serious harm and a failure to take reasonable measures to abate
this risk."  <u>Kitchen</u>, 759 F.3d at 482.

The constitutional guarantee of due process encompasses both
procedural and substantive rights.  <u>Cnty. of Sacramento v. Lewis</u>,
523 U.S. 833, 840 (1998).  The procedural protections include, at
a minimum, notice and an opportunity to be heard in a meaningful
time and manner.  <u>Gibson v. Tex. Dep't of Ins.–Div. of Workers'
Compensation</u>, 700 F.3d 227, 239 (5th Cir. 2012)(quoting <u>Fuentes v.
Shevin</u>, 407 U.S. 67, 80 (1972)).  The analysis of a procedural due
process claim has two steps: 1) whether a liberty or property
interest exists with which the State has interfered; and 2) whether
the procedures attendant upon the deprivation were constitutionally
sufficient.  <u>Meza v. Livingston</u>, 607 F.3d 392, 399 (5th Cir.
2010)(quoting <u>Ky. Dep't of Corr. v. Thompson</u>, 490 U.S. 454, 460
(1989), <u>overruled in part on other grounds</u>, <u>Sandin v. Conner</u>, 515
U.S. 472 (1995)), <u>clarified on denial of reh'g</u>, 2010 6511727 (5th
Cir. 2010).

The substantive due process right protects individuals from
arbitrary or conscience-shocking executive action.  <u>See Doe ex rel.
Magee v. Covington Cnty. Sch. Dist. ex rel. Keys</u>, 675 F.3d 849, 867
(5th Cir. 2012)(quoting <u>Cnty. of Sacramento</u>, 523 U.S. at 847).  The

protection is limited, however.  If another provision of the U.S. Constitution provides "an explicit textual source of constitutional protection," the plaintiff's claims must be analyzed under that provision, rather than the "more generalized notion of substantive due process."  Wilson v. Birnberg, 667 F.3d 591, 599 (5th Cir. 2012)(quoting Conn v. Gabbert, 526 U.S. 286, 293 (1999)).

### III. Analysis

Defendant Montgomery County seeks dismissal of Plaintiff's remaining constitutional claims of false arrest/false imprisonment, excessive force, failure to provide medical care and treatment, failure to provide her with due process, and negligence in the condition or use of tangible property.[240]  Defendant Skero seeks summary judgment on the only remaining claim against him of illegal seizure/false arrest.[241]  Defendant Williams seeks summary judgment on the remaining claims against him of false arrest, excessive force,  unlawful search and seizure and negligence.

### A.  Defendant Montgomery County's Motion to Dismiss

Rule 12(b)(6) allows dismissal of an action whenever the

---

[240]    Defendant Montgomery County's motion also sought dismissal of the state law claims and the request for declaratory judgment.  See Doc. 41, Def. Montgomery County's Mot. to Dismiss Pl.'s 2nd Am. Compl. pp. 5-13.  As noted in the procedural background, Plaintiff voluntarily dismissed all of the state law claims except the negligent condition or use of tangible property and dismissed the request for declaratory judgment against Defendant Montgomery County.

[241]    Defendant Skero's motion also sought summary judgment in his favor on all of the state law claims and the request for declaratory judgment.  See Doc. 48, Def. Skero's Mot. for Summ. J. pp. 2-3.  As noted in the procedural background, Plaintiff voluntarily dismissed all of the state law claims and the request for declaratory judgment against Defendant Skero.

complaint, on its face, fails to state a claim upon which relief can be granted.  When considering a motion to dismiss, the court should construe the allegations in the complaint favorably to the pleader and accept as true all well-pleaded facts.  <u>Harold H. Huggins Realty, Inc. v. FNC, Inc.</u>, 634 F.3d 787, 803 n.44 (5th Cir. 2011)(quoting <u>True v. Robles</u>, 571 F.3d 412, 417 (5th Cir. 2009)).

A complaint need not contain "detailed factual allegations" but must include sufficient facts to indicate the plausibility of the claims asserted, raising the "right to relief above the speculative level." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007); <u>see also</u> <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009). Plausibility means that the factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Iqbal</u>, 556 U.S. 678.  A plaintiff must provide "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." <u>Twombly</u>, 550 U.S. at 555.  In other words, the factual allegations must allow for an inference of "more than a sheer possibility that a defendant has acted unlawfully." <u>Iqbal</u>, 556 U.S. 678.

## A.  Constitutional Claims

The constitutional claims alleged against Defendant Montgomery County are false arrest/false imprisonment under the Fourth Amendment and excessive force, failure to provide medical care and treatment, and failure to provide due process pursuant to the

Fourteenth Amendment.

Defendant Montgomery County argues that Plaintiff failed to identify an unconstitutional official county policy or to plead sufficient facts to suggest an unconstitutional pervasive custom, either of which led to the alleged violations of her constitutional rights. Defendant Montgomery County further contends that none of the conditions of confinement about which Plaintiff complains rises to the level of a constitutional violation. Plaintiff counters that she successfully pled constitutional violations and that she sufficiently alleged a county policy by stating that all of the misconduct referred to in her pleading "was the result of a policy, practice, and/or pattern of Defendant Montgomery County that was in violation of Plaintiff's constitutional rights."[242]

A county may be held liable under Section 1983 only for its own illegal acts, not pursuant to a theory of vicarious liability. Connick v. Thompson, ____ U.S. ____, 131 S. Ct. 1350, 1359 (2011)(quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 479 (1986)). To succeed on a claim under Section 1983, the plaintiff must establish, not only that an individual state actor violated her constitutional rights, but that "(1) an official policy (2) promulgated by the municipal policymaker (3) was the moving force behind the violation of a constitutional right." Peterson v. City

---

[242]   Doc. 45, Pl.'s Resp. to Def. Montgomery Cnty.'s Mot. to Dismiss p. 13.

of Fort Worth, Tex., 588 F.3d 838, 847 (5th Cir. 2009)(citing Piotrowski v. City of Houston, 237 F.3d 567, 578 (5th Cir. 2001)). "Official [local-government] policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." Connick, 131 S. Ct. at 1359; see also Peterson, 588 F.3d at 850.

The first element Plaintiff must satisfy in alleging a constitutional violation against Defendant Montgomery County is the factual assertion that a state actor violated her constitutional rights. Plaintiff's allegations that the jail staff tied her down, refused to provide her basic necessities, discontinued her prescription medications, and prevented her from securing bail, among other allegations, sound egregious. The court does not decide whether any or all rise to the level of the constitutional violations alleged. Instead, the court assumes, without deciding, that Plaintiff's factual allegations are sufficient to assert violations of the constitutional rights protecting against false arrest/false imprisonment,[243] excessive force, failure to provide medical care, and failure to provide due process. In order to survive the motion to dismiss, Plaintiff's allegations must provide factual support for the existence of a formal or informal policy

---

[243]     Although the court had determined that probable cause supported Plaintiff's arrest, that finding is based on the summary judgment evidence. The court must rely only on the facts pled in deciding Defendant Montgomery County's motion to dismiss.

that was the moving force behind each alleged constitutional violation.

As Plaintiff points out in her response, her complaint stated:

In addition to the foregoing, Defendant Montgomery County negligently destroyed and/or discarded videotape evidence of the wrongful conduct and mistreatment of Plaintiff while she was incarcerated in violation of her due process rights.  This action, along with the misconduct referred to above in the causes of action brought by Plaintiff against Defendant Montgomery County, was the result of *an official policy, practice, pattern and/or custom* of Defendant Montgomery County that was in violation of Plaintiff's constitutional rights.[244]

Although Plaintiff pointed to no other part of her complaint that filled the policy requirement, the court found the following statement in her complaint:

The supervisory employees at Montgomery County were responsible for the creation of the policies and customs that caused [Plaintiff] to not receive her prescription medications, brought on extreme depression, kept a [sixty-two-]year-old lady in prison for five days without any probable cause, placed her in solitary confinement, and unlawfully restrained a frightened woman.[245]

The first of the above statements is nothing more than a formulaic recitation of a required element for a successful constitutional claim against a local government.  Neither of the statements identified any particular policy, but, more fundamentally, neither states whether the infringing policy or policies were formal written policies, decisions by policy-makers,

---

[244]    Doc. 45, Pl.'s Resp. to Def. Montgomery Cnty.'s Mot. to Dismiss p. 13 (emphasis added)(quoting Doc. 39, Pl.'s 2nd Am. Compl. p. 21).

[245]    <u>Id.</u>

or persistent and widespread practices. The second statement attributes the formulation of policies and customs to supervisory employees, which are not necessarily policy-makers for Defendant County. It also focuses on the single incident involving her, rather than suggesting a persistent and widespread practice. Furthermore, Plaintiff failed to plead facts connecting the offending policy or policies to each alleged constitutional violation. Plaintiff simply speculated that Defendant Montgomery County must have had a policy or custom that violated her rights.

The court also notes that Plaintiff alleged, based solely on the facts of her detention, that the supervisory employees at the jail failed "to adequately train and supervise correctional officers, medical staff, and mental health staff" in the areas of "safety and well-being of prisoners" and sensitivity to Jewish inmates.[246] This statement arguably asserts a policy based on failure to train and supervise the jail staff.

Although courts have recognized that the failure to train or to supervise employees may give rise to local-government liability under Section 1983, they have done so in very limited circumstances. See Connick, 131 S. Ct. at 1359; Zarnow v. City of Wichita Falls, Tex., 614 F.3d 161, 169, 170 (5th Cir. 2010). In fact, the Supreme Court has cautioned, "A [local government's] culpability for a deprivation of rights is at its most tenuous

---

[246]   Doc. 39, Pl.'s 2nd Am. Compl. p. 15.

where a claim turns on a failure to train." <u>Connick</u>, 131 S. Ct. at 1359.

A plaintiff must show that: "(1) the training procedures were inadequate; (2) the city's policymaker was deliberately indifferent in adopting the training policy; and (3) the inadequate training policy directly caused [the plaintiff's] injury." <u>Carnaby</u>, 636 F.3d at 189; <u>see also</u> <u>Zarnow</u>, 614 F.3d at 170.  In order to show deliberate indifference by a local government, a plaintiff must generally show a pattern of similar constitutional violations by untrained employees. <u>Connick</u>, 131 S. Ct. at 1360.  An inference of a policy of authorizing police misconduct is not warranted based on a single incident.  <u>Fraire v. City of Arlington</u>, 957 F.2d 1268, 1278 (5th Cir. 1992); <u>see also</u> <u>Piotrowski</u>, 237 F.3d at 582.

Plaintiff's allegations that the jail staff was inadequately trained in the area of "safety and well-being of prisoners" is far too general to infer a policy that could have caused Plaintiff's alleged constitutional harm.  Plaintiff failed to provide specific factual support as to how the training and supervision was deficient in any way that would have impacted her encounter with the jail staff or caused the alleged constitutional violations. <u>See</u> <u>Zarnow</u>, 614 F.3d at 170 (stating that "a plaintiff must allege with specificity how a particular training program is defective").

Her allegation that the jail staff was inadequately trained with regard to sensitivity to Jewish inmates could not be, as a

55

matter of law, the moving force directly causing false arrest/false imprisonment, excessive force, failure to provide medical care and treatment, or failure to provide due process.   Plaintiff did not plead an equal protection claim, but, even if she had, insensitivity alone would not cause an equal protection violation.

Plaintiff failed to state sufficient facts to indicate the plausibility of her constitutional claims against Defendant Montgomery County.   See Twombly, 550 U.S. at 555.   The allegations are too vague to raise more than the sheer possibility that an official policy was the moving force behind the violation of her constitutional rights, which is not enough to state a claim under Twombly and Iqbal.

**B.   State Law Negligence Claim**

A Texas county is a "governmental unit" covered by the TTCA. Tex. Civ. Prac. & Rem. Code Ann. § 101.001(3)(B).   Generally, the TTCA waives immunity for property damage, personal injury and death caused by wrongful acts of employees if arising "from the operation or use of a motor-driven vehicle or motor-driven equipment" or caused by "a condition or use of tangible personal or real property."   See Tex. Civ. Prac. & Rem. Code Ann. § 101.021.   No waiver of immunity is available for claims "arising out of assault, battery, false imprisonment, or any other intentional tort."   Tex. Civ. Prac. & Rem. Code Ann. § 101.057.

Defendant Montgomery County argues that Plaintiff's negligence

claims either do not fit within the waiver for negligence claims or arise out of an intentional act for which sovereign immunity is not waived.

None of Plaintiff's allegations involve a vehicle or equipment. Plaintiff's claims can be categorized as conditions of jail premises, which she voluntarily dismissed, and as use of tangible personal property. The only allegation pled in Plaintiff's amended complaint that fits within the latter category is that the jail staff "negligently used restraints to improperly tie Plaintiff down."[247] Although cast as an act of negligence, using restraints to tie down Plaintiff arises out of an intentional act for which Texas has not waived immunity. See Tex. Civ. Prac. & Rem. Code Ann. § 101.057; City of Waco v. Williams, 209 S.W.3d 216, 223 (Tex. App.—Waco 2006, pet. denied).

Defendant Montgomery County's motion to dismiss should be granted as to all remaining claims.

## B.  **Defendants Skero and Williams' Motions for Summary Judgment**

Summary judgment is warranted when the evidence reveals that

---

[247]    See Doc. 39, Pl.'s 2nd Am. Compl. pp. 20-21.  In her live pleading, Plaintiff also alleged that Defendant Montgomery County failed to provide a toothbrush, toothpaste, towel, and blanket and required her to lie down from 6:30 a.m. until 9:30 p.m. each day, seized her medical braces, took cash from her purse, and withheld her prescription medications. See id. None of these actions or omissions involved the condition or use of tangible property.  Plaintiff attempts to avoid that requirement in her response to Defendant Montgomery County's motion by adding that all of those actions or omissions were pursuant to a "presumed . . . written policy." See Doc. 45, Pl.'s Resp. to Def. Montgomery Cnty.'s Mot. to Dismiss.  That clever rewriting, however, is unavailing.  The Supreme Court of Texas has dispensed with the argument that a policy manual constitutes tangible personal property as used in the statute. See Tex. Dep't of Pub. Safety v. Petta, 44 S.W.3d 575, 580-81 (Tex. 2001).

no genuine dispute exists regarding any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Stauffer v. Gearhart, 741 F.3d 574, 581 (5th Cir. 2014). A material fact is a fact that is identified by applicable substantive law as critical to the outcome of the suit. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Ameristar Jet Charter, Inc. v. Signal Composites, Inc., 271 F.3d 624, 626 (5th Cir. 2001). To be genuine, the dispute regarding a material fact must be supported by evidence such that a reasonable jury could resolve the issue in favor of either party. See Royal v. CCC & R Tres Arboles, L.L.C., 736 F.3d 396, 400 (5th Cir. 2013)(quoting Anderson, 477 U.S. at 248).

The movant must inform the court of the basis for the summary judgment motion and must point to relevant excerpts from pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of genuine factual issues. Celotex Corp., 477 U.S. at 323; Topalian v. Ehrman, 954 F.2d 1125, 1131 (5th Cir. 1992). The movant may meet this burden by demonstrating an absence of evidence in support of one or more elements of the case for which the nonmovant bears the burden of proof. See Celotex Corp., 477 U.S. at 322; Exxon Corp. v. Oxxford Clothes, Inc., 109 F.3d 1070, 1074 (5th Cir. 1997).

If the moving party carries its burden, the nonmovant may not

rest on the allegations or denials in his pleading but must respond with evidence showing a genuine factual dispute. <u>Stauffer</u>, 741 F.3d at 581 (citing <u>Hathaway v. Bazany</u>, 507 F.3d 312, 319 (5th Cir. 2007)). Conclusory allegations, unsubstantiated assertions, improbable inferences, unsupported speculation, or only a scintilla of evidence will not carry this burden. <u>Brown v. City of Houston, Tex.</u>, 337 F.3d 539, 540-41 (5th Cir. 2003).

If the evidence would not allow a reasonable jury to decide the dispute in favor of the nonmovant, the dispute is not genuine. <u>See</u> <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007)(citing <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." <u>Id.</u>

Government officials have qualified immunity from Section 1983 "liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Pearson v. Callahan</u>, 555 U.S. 223, 231 (2009)(quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)). Qualified immunity protects an officer regardless of whether the error was "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact."

Pearson, 555 U.S. at 231 (quoting Groh v. Ramirez, 540 U.S. 551, 567 (2004)).

By pleading qualified immunity in good faith, a summary judgment movant shifts the burden to the nonmovant to rebut the movant's assertion.  Brumfield v. Hollins, 551 F.3d 322, 326 (5th Cir. 2008); Hathaway, 507 F.3d at 319.  Although no longer mandatory, the two-step process set out by the court in Saucier v. Katz, 533 U.S. 194 (2001), still provides guidance in analyzing qualified immunity.  See Pearson, 555 U.S. at 236, 242 (stating that the Saucier analytic method "should no longer be regarded as mandatory" but allowing that it may be "worthwhile in particular cases").  The first step is determining whether the officer's conduct violated a constitutional right.  Hope v. Pelzer, 536 U.S. 730, 736 (2002).  The second step is to determine whether the officer's actions were objectively reasonable in light of clearly established law at the time of the violation.  Id. at 739.

**1.  Defendant Skero's Motion**

Defendant Skero asserts qualified immunity against the alleged Fourth Amendment violations because he stopped Plaintiff based on reasonable suspicion, he did not arrest Plaintiff, and, assuming he participated in the arrest, it was supported by probable cause.  Plaintiff disagrees on all points.  She contends that the video recording from Defendant Skero's dash camera shows that he did not have reasonable suspicion to stop her, he did participate in her

arrest, and he did not have probable cause to arrest her.

The Supreme Court has "firmly rejected the argument that reasonable cause for an investigative stop can only be based on the officer's personal observation, rather than on information supplied by another person." <u>Prado Navarette</u>, 134 S. Ct. at 1688 (alterations omitted)(quoting <u>Adams v. Williams</u>, 407 U.S. 143, 147 (1972)). The court determines on a case-by-case basis whether a 911 call provides sufficient basis to justify a traffic stop based on the following factors: (1) "the credibility and reliability of the informant;" (2) "the specificity of the information contained in the tip or report;" (3) "the extent to which the information in the tip or report can be verified by officers in the field;" and (4) "whether the tip or report concerns active or recent activity, or has instead gone stale." <u>United States v. Martinez</u>, 486 F.3d 855, 861 (5th Cir. 2007)(quoting <u>United States v. Gonzalez</u>, 190 F.3d 668, 672 (5th Cir. 1999)); <u>see also</u> <u>Prado Navarette</u>, 134 S. Ct. at 1688-89.

In <u>Prado Navarette</u>, the Supreme Court provided on-point guidance for the court's analysis here. There, a 911 caller reported that a truck had run her off the highway. <u>Prado Navarette</u>, 134 S. Ct. at 1686-87. The 911 caller provided a description and an license plate number for the offender. <u>See</u> <u>id.</u> at 1686. Shortly thereafter, a highway patrol officer stopped a truck meeting the description and license plate number. <u>See</u> <u>id.</u> at

61

1687.  The stop led to the discovery of thirty pounds of marijuana and the arrest of both the driver and the passenger.  Id.  The issue in the case was whether the evidence discovered during the stop should be suppressed in the criminal proceeding because the traffic stop lacked reasonable suspicion.  See id.

Assuming the 911 caller was anonymous, the Court engaged in a thorough discussion of the tip's reliability and found multiple factors supported relying on it.  See id. at 1688-90.  Included in those factors were the identification of a specific vehicle, a report based on claimed eyewitness knowledge, a detailed description of alleged wrongdoing, a contemporaneous report, the confirmation by an officer of the described vehicle in the vicinity of the alleged dangerous driving, and the use of the 911 emergency system to make the report.  Id.

The Court concluded that "the behavior alleged by the 911 caller, viewed from the standpoint of an objectively reasonable police officer, amount[ed] to reasonable suspicion of drunk driving."  Id. at 1690 (internal alterations and quotation marks omitted) (quoting Ornelas v. United States, 517 U.S. 690, 696 (1996).  The court stated:

> The 911 caller in this case reported more than a minor
> traffic infraction and more than a conclusory allegation
> of drunk or reckless driving.  Instead, she alleged a
> specific and dangerous result of the driver's conduct:
> running another car off the highway.  That conduct bears
> too great a resemblance to paradigmatic manifestations of
> drunk driving to be dismissed as an isolated example of
> recklessness.  Running another vehicle off the road

> suggests lane-positioning problems, decreased vigilance, impaired judgment, or some combination of those recognized drunk driving cues. . . . And the experience of many officers suggests that a driver who almost strikes a vehicle or another object . . . is likely intoxicated. . . . As a result, we cannot say that the officer acted unreasonably under these circumstances in stopping a driver whose alleged conduct was a significant indicator of drunk driving.

Id. at 1691.  The court also held that an officer need not rule out the possibility of innocent conduct or personally observe additional suspicious conduct in order to establish reasonable suspicion.  Id.

Here, Gammons' 911 call had all the indicia of reliability found in Prado Navarette and more.  Gammons: (1) supplied the make, model, and license of the car which allegedly was being driven dangerously; (2) provided his name and telephone number; (3) reported having witnessed the vehicle traveling down the shoulder for more than a mile at a high rate of speed and forcing cars into different lanes; (4) contemporaneously reported that the driver was unable to maintain lanes; (5) contemporaneously reported that she hit a construction barrier but continued; (6) contemporaneously reported that she was swerving all over the road; and (7) contemporaneously reported that she nearly bumped a car.  This court finds, as a matter of law, that Defendant Skero had reasonable suspicion to conduct an investigatory stop based solely on the information provided by Gammons in the 911 call.  Defendant Skero did not violate Plaintiff's right to be free from

unreasonable seizures by stopping her.

Regarding the arrest, the video recordings provide unequivocal evidence that Defendant Williams arrested Plaintiff based only on his assessment of probable cause. See Carnaby, 636 F.3d at 187 (citing Scott, 550 U.S. at 372)("Although we review evidence in the light most favorable to the nonmoving party, we assign greater weight, even at the summary judgment stage, to the facts evident from video recordings taken at the scene.") As is evident from the video recordings, Defendant Williams neither requested nor received any input from Defendant Skero on the matter before deciding to arrest Plaintiff. Defendant Skero's only involvement in Plaintiff's arrest was to assist Defendant Williams in handcuffing Plaintiff and in escorting her to Defendant Williams' patrol unit. Plaintiff provided no evidence contradicting this finding. In fact, she indicated at her deposition that she was not able to identify which officer arrested her.[248]

Plaintiff's claim against Defendant Skero for false arrest/false imprisonment should be dismissed.

### 2. Defendant Williams' Motion

Defendant Williams asserts qualified immunity against the alleged Fourth Amendment violations because there was reasonable suspicion for the stop, there was probable cause for the arrest,

---

[248]   See Doc. 93-1, Ex. A to Pl.'s App. in Support of Pl.'s Resp. to Def. Skero's Supplement to Mot. for Summ. J., Dep. of Pl. pp. 116-17.

the Eighth Amendment protection against excessive force does not apply to pretrial detentions, and the search and seizure of her vehicle, purse, medication, and dog were permissible under the circumstances.   He also moves for summary judgment on the negligence claim as barred by Texas Civil Practice and Remedies Code § 101.106(f) and by official immunity.   Plaintiff argues in response that Defendant Williams is not entitled to qualified immunity and that Texas Civil Practice and Remedies Code § 101.106(f) does not bar her negligence claim because the claim is based on the alleged ultra vires acts of Defendant Williams.

Having decided that the traffic stop was constitutional, the court moves to the claim that the arrest was without probable cause.   The critical question when deciding whether qualified immunity protects an officer from false arrest/false imprisonment claims, is whether "a reasonable officer could have believed the arrest to be lawful, in light of clearly established law and the information the officer possessed." Babb v. Dorman, 33 F.3d 472, 477 (1994) (internal alterations and quotation marks omitted) (quoting Hunter v. Bryant, 502 U.S. 224, 227 (1991)).   The Fifth Circuit has characterized the standard as "arguable" probable cause.   Id. (quoting Gorra v. Hanson, 880 F.2d 95, 97 (8th Cir. 1989)); see also Brown v. Lyford, 243 F.3d at 190 (quoting Hart v. O'Brien, 127 F.3d 424, 444 (5th Cir. 1997) abrogated on another issue by Kalina v. Fletcher, 522 U.S. 118 (1997))(stating that, in

65

order for an officer to lose qualified immunity, "there must not
even 'arguably' be probable cause for the . . . arrest").  Even
officers who are reasonably mistaken about the existence of
probable cause are entitled to qualified immunity.  <u>Babb</u>, 33 F.3d
at 477 (quoting <u>Hunter</u>, 502 U.S. at 227).

When Defendant Williams arrested Plaintiff, he had within his
knowledge that a 911 caller had reported that Plaintiff was driving
dangerously, including hitting a construction barrier, driving fast
on the shoulder, and forcing other cars to change lanes.  He also
had been informed by Defendant Skero that Defendant Skero had
observed Plaintiff swerving immediately before he made the stop,
being unsteady walking and nearly falling, slurring her speech;
that Plaintiff would not follow directions when he attempted the
HGN test; and that Plaintiff had given inconsistent reports
regarding when she last took a pain pill and whether she had hit a
construction barrier.  In addition to those second-hand reports
from reliable sources, Defendant Williams had observed Plaintiff
swaying and slurring her speech.  Defendant Williams attempted the
HGN test with Plaintiff six times, but Plaintiff never successfully
complied with his instructions.

Plaintiff contends that Defendants Skero and Williams were
wrong about several of their observations.  Unfortunately for
Plaintiff, the video recordings tend to support many of the cited
facts that Defendant Williams factored into the probable cause

66

calculus.   For example, the video recording shows that: (1) Plaintiff did swerve at least once after Defendant Skero pulled in behind her; (2) she was unsteady on her feet, leaning on her car for a significant amount of the time and awkwardly stepping off the pavement into the grass; (3) she initially denied hitting the wall and taking pain medication and later conceded that she had done both; and (4) she did rock slightly as Defendant Williams administered the HGN test.  Although the court cannot tell from the video whether Plaintiff was successfully completing the HGN test, the court can tell that Defendants Skero and Williams both assessed that she had not.   Based on the video, reasonable people could disagree as to whether Plaintiff was swaying or slurring her speech.

The court need not weigh the evidence or credibility to determine from the video recording that a reasonable officer could have believed the arrest was lawful based on all of the information he possessed.   The 911 call and Defendant Skero's report were from reliable sources, and Defendant Williams was reasonable in factoring that information into his determination.

Plaintiff also argues that much of her behavior was caused by innocent conduct.   That is not relevant to Defendant Williams' probable cause finding.   He was not required to rule out innocent conduct.   See Prado Navarette, 134 S. Ct. at 1691.   Plaintiff cites to other immaterial facts, such as Defendant Skero's speeding, her

insistence that she had not been drinking, and the 911 caller's details about body parts flying off of her car when she hit the wall.   None of these facts are relevant to Defendant Williams' determination that probable cause existed to arrest Plaintiff for driving while intoxicated by prescription medication.

The court finds that Defendant Williams is entitled to qualified immunity on Plaintiff's false arrest/false imprisonment claim because the evidence would give a reasonable officer at least arguable probable cause.

The only basis on which Defendant Williams moves for summary judgment on Plaintiff's excessive force claim is Plaintiff's failure to plead the claim pursuant to the proper constitutional amendment.   The court will not grant summary judgment on that basis.

Moreover, Plaintiff testified at her deposition that she suffered injuries as a result of Defendant Williams' handcuffing her, escorting her to his patrol unit, and placing her in the patrol unit.[249]   She presented photographs at the deposition that she claimed showed resulting injuries to her wrists and arms and testified that she also experienced numbness in one of the fingers in her left hand.[250]   Plaintiff stated that she went to the

---

[249]   See Doc. 93-1, Ex. A to Pl.'s App. in Support of Pl.'s Resp. to Def. Skero's Supplement to Mot. for Summ. J., Dep. of Pl. pp. 102-03.

[250]   See id. pp. 85-88; 133-38.

emergency room immediately after being released from detention.[251]

The court cannot determine from the summary judgment evidence whether Plaintiff's injuries were more than de minimis or whether they directly resulted from Defendant Williams' use of excessive force that was unreasonable. Ultimately, if the evidence shows only that Plaintiff suffered minor wrist injuries from Defendant Williams' handcuffing too tightly, she cannot prevail. See Glenn, 242 F.3d at 314 (finding "that handcuffing too tightly, without more, does not amount to excessive force"). For now, though, the court finds that Plaintiff has raised a fact issue on her excessive force claim against Defendant Williams.

The final constitutional issue is the search and seizure of Plaintiff's purse, medication, vehicle, and dog. The evidence shows that Defendant Williams searched Plaintiff's purse after arresting her for driving while intoxicated. The search was justified, at the very least, because he saw medication bottles in her purse when he complied with Plaintiff's request to retrieve a tissue from her purse. Without a doubt, Plaintiff's request provided Defendant Williams with voluntary consent to look in her purse for a tissue. See United States v. Freeman, 482 F.3d 829, 831-32 (5th Cir. 2007)(stating that the totality of circumstances determines whether consent was voluntarily given). When Defendant

---

[251]    See id. p. 16.  Plaintiff could not recall whether she received treatment for her hand injury at the emergency room.  See id. pp. 88-89.  At some point, she saw a hand specialist for a nerve induction test but the specialist did not prescribe any treatment.  See id. p. 18.

Williams looked in her purse, the medication bottles were visible and were incriminating in light of Plaintiff's arrest for driving while intoxicated.  Therefore, Defendant Williams was allowed to seize the medications pursuant to the plain view doctrine.  See Trent v. Wade, 776 F.3d 368, 386 (5th Cir. 2015)(quoting Horton v. California, 496 U.S. 128, 136–37 (1990))("Supreme Court precedent permits officers to seize contraband in plain view so long as its incriminating character is 'immediately apparent' and the officers are 'lawfully located in a place from which the object can be plainly seen.'").

The impoundment of Plaintiff's car was reasonable under the Fourth Amendment.  See United States v. McKinnon, 681 F.3d 203, 207–08 (5th Cir. 2012) (stating that the community caretaking exception to the prohibition against warrantless searches and seizures is well established and allows police to remove from the streets vehicles that impede traffic or threaten public safety); United States v. Casto, 166 F.3d 728, 734 (5th Cir. 1999)(stating that the impoundment of a vehicle after the lawful arrest of its occupants is permissible as long as it was in furtherance of a community caretaking purpose).

Likewise, an accompanying inventory search is consistent with constitutional principles "if it is conducted pursuant to standardized regulations and procedures that are consistent with (1) protecting the property of the vehicle's owner, (2) protecting

the police against claims or disputes over lost or stolen property, and (3) protecting the police from danger." McKinnon, 681 F.3d at 209 (quoting United States v. Lage, 183 F.3d 374, 380 (5th Cir. 1999)); see also Castro, 166 F.3d at 734 (stating that an inventory search was authorized after impoundment).   Defendant Williams inventoried the contents of Plaintiff's vehicle for the stated purpose of protecting Plaintiff's property.   Plaintiff has presented no evidence that the inventory search was not conducted properly or was based on an improper motive.

Defendant Williams' decision to have animal control pick up Plaintiff's dog and keep it in the pound while Plaintiff was detained in jail was both an act of caretaking and of protecting Plaintiff's property.   The dog needed to be cared for during Plaintiff's incarceration.   Defendant Williams offered to let Plaintiff have someone she knew take care of the dog, but Plaintiff did not know of anyone who could.   Obviously, the dog could not stay in the car, be left on the side of the road, or accompany Plaintiff to the jail.   Defendant Williams only choice was to send the dog to animal control where people would feed and care for it.

The last claim asserted against Defendant Williams that the court must consider is the allegation that he "negligently restrained [Plaintiff], a cooperative [sixty-two-]year-old woman with extreme health issues, in handcuffs that were too tight, from

which [Plaintiff] developed bruises and open wounds."[252]   Defendant

argues the claim must be dismissed pursuant to the election-of-

remedies provision of the Texas Tort Claims Act.   Plaintiff

responds by arguing that the claim could not have been brought

against the state because Defendant Williams was not authorized to

make false testimony.  He acted outside the scope of his employment

by "break[ing] the law and violat[ing] Plaintiff's Constitutional

rights"[253] because those acts were not authorized by the state.

The election of remedies provision of the Texas Tort Claims

Act, states, in part:

> If a suit is filed against an employee of a governmental
> unit based on conduct within the general scope of that
> employee's employment and if it could have been brought
> under this chapter against the governmental unit, the
> suit is considered to be against the employee in the
> employee's official capacity only.   On the employee's
> motion, the suit against the employee shall be dismissed
> unless the plaintiff files amended pleadings dismissing
> the employee and naming the governmental unit as
> defendant on or before the 30th day after the date the
> motion is filed.

Tex. Civ. Prac. & Rem. Code Ann. § 101.106.   As explained by the

Supreme Court of Texas in Franka v. Velasquez, 332 S.W.3d 367, 381

(Tex. 2011)(quoting Tex. Civ. Prac. & Rem. Code Ann. § 101.106:

> Properly construed, section 101.106(f)'s two conditions
> are met in almost every negligence suit against a
> government employee: he acted within the general scope of
> his employment and suit could have been brought under the
> Act—that is, his claim is in tort and not under another

---

[252]    Doc. 39, Pl.'s 2nd Am. Compl. p. 19.

[253]    Doc. 69, Pl.'s Resp. to Def. Williams' Mot. for Summ. J.

statute that independently waives immunity. In such
cases, the suit "is considered to be against the employee
in the employee's official capacity only," and the
plaintiff must promptly dismiss the employee and sue the
government instead.

Arresting and handcuffing Plaintiff after an investigation
based on a 911 call are actions within the general scope of his
employment as a state trooper. For the reasons explained in
Franka, Plaintiff's negligence claim could have been brought
against the governmental unit.

Plaintiff's reliance on The City of El Paso v. Heinrich, 284
S.W.3d 366 (Tex. 2009), is misplaced. That case dealt with an
action brought against a city and others by a police officer's
widow, alleging the breach of fiduciary duty in the reduction of
her pension benefits. The case does not equate official acts
authorized by the state of acts in the general scope of an
official's employment. See id. Section 101.106(f) is not even
mentioned in the case. See id.

As Plaintiff did not promptly dismiss Defendant Williams upon
his motion, the negligence claims must be dismissed.

### IV.  Conclusion

Based on the foregoing, the court **RECOMMENDS** that Defendant
Montgomery County's motion to dismiss be **GRANTED**, Defendant Skero's
motion for summary judgment and supplement be **GRANTED**, Defendant
Williams' motion for summary judgment and supplemental motion for
summary judgment be **GRANTED IN PART AND DENIED IN PART**. If this

73

Memorandum and Recommendation is adopted, the only remaining claim in this action is Plaintiff's excessive force claim against Defendant Williams.

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections thereto pursuant to Rule 72(b) and General Order 2002-13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk electronically. Copies of such objections shall be mailed to opposing parties and to the chambers of the undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

**SIGNED** in Houston, Texas, this 27th day of February, 2015.

U.S. MAGISTRATE JUDGE