IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JEAN GOLDMAN, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-14-433 |
| | § | |
| CHARLES WILLIAMS, BRIAN SKERO, | § | |
| and MONTGOMERY COUNTY, TEXAS, | § | |
| | § | |
| Defendants. | § | |

## <u>MEMORANDUM AND RECOMMENDATION</u>

Pending before the court[1] is Defendant Charles Williams' ("Williams") Second Motion for Summary Judgment (Doc. 124). The court has considered the motion, the response, the reply, the summary judgment evidence, and the applicable law. For the reasons set forth below, the court **RECOMMENDS** that Defendant Williams' Second Motion for Summary Judgment be **GRANTED**.

### I.  Case Background

Plaintiff filed this civil rights action against a municipal police officer, a state trooper, and a county, alleging they violated Plaintiff's constitutional rights. The allegations arose out of Plaintiff's arrest on February 26, 2012, for driving while intoxicated and her subsequent detention at the Montgomery County jail. Earlier this year, the court granted the police officer's

---

[1]      This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72.  Doc. 22.

motion for summary judgment and the county's motion to dismiss.[2]
The court also granted the state trooper's motion for summary
judgment as to all claims except Plaintiff's constitutional claim
of excessive force.[3]

The factual background below focuses only on the facts related
to Plaintiff's excessive-force claim.   It is composed almost
entirely of excerpts from the court's prior memorandum and
recommendation.[4]

When Defendant Williams arrived at the scene where Willis
Police Officer Brian Skero ("Officer Skero") had stopped Plaintiff,
Defendant Williams conferred with Officer Skero about what the
officer had observed.   Later, Defendant Williams then administered
the Horizontal Gaze Nystagmus test, a sobriety field test that asks
a suspect to follow the officer's finger with her eyes without
moving her head.   Based on his training and experience, Defendant
Williams decided that Plaintiff "had lost the normal use of her
mental and physical faculties and was intoxicated."

Defendant Williams told Plaintiff to turn around and put her
hands behind her back.   Plaintiff asked if she could "request the

---

[2]      See Doc. 103, Mem. & Recommendation Dated Feb. 27, 2015; Doc. 115
Order Dated Apr. 1, 2015.

[3]      See Doc. 103, Mem. & Recommendation Dated Feb. 27, 2015; Doc. 115
Order Dated Apr. 1, 2015.

[4]      See Doc. 103, Mem. & Recommendation Dated Feb. 27, 2015 pp. 2-32.
The excerpted portions are not cited to evidence; however, any new factual
information is cited to evidence.

right to remain silent." Defendant Williams repeated the order to turn around twice, and, after the second time, Plaintiff said, "I will not." At that point, as Defendant Williams repeated his order once more, Officer Skero approached Plaintiff from a few feet away to assist Defendant Williams in handcuffing Plaintiff. Each of the officers pulled one of Plaintiff's hands out of a pocket of her coat and moved it to her back to apply the handcuffs.[5]

Defendant Williams asseverated that he followed standard procedures in handcuffing Plaintiff, specifically noting that, per his usual practice, he placed the handcuffs on her wrists with her hands behind her back and checked the tightness by visually inspecting them and checking to see if he could fit his pinky finger between the handcuffs and Plaintiff's wrists.[6] He "double-locked the handcuffs so that they would not become tighter if pressed."[7] Defendant Williams denied any intent to harm Plaintiff.[8]

After being handcuffed, Plaintiff asked about her car, and Defendant Williams said that it was going to be towed. Plaintiff

---

[5]    See Doc. 49-17, Ex. 11-A to Def. Skero's Brief in Support of Summ. J., Def. Skero's Dash Cam Video Recording.

[6]    Doc. 124-3, Ex. 3 to Def.'s 2d Mot. for Summ. J., Aff. of Charles Williams p. 1; see also Doc. 49-17, Ex. 11-A to Def. Skero's Brief in Support of Summ. J., Def. Skero's Dash Cam Video Recording. The video recording is not clear enough to confirm or rule out that Defendant Williams visually inspected or used his pinky to test the tightness of the handcuffs. See Doc. 49-17, Ex. 11-A to Def. Skero's Brief in Support of Summ. J., Def. Skero's Dash Cam Video Recording.

[7]    Doc. 124-3, Ex. 3 to Def.'s 2d Mot. for Summ. J., Aff. of Charles Williams p. 1.

[8]    See id.

protested that she could not have it towed because the car contained "over a half million dollars in jewelry in there." Plaintiff also expressed concern about her dog, which was in the car.

Shortly thereafter, Defendant Williams told Plaintiff that they were calling an ambulance to have emergency medical technicians ("EMTs") examine Plaintiff. Plaintiff protested, saying that she did not need medical attention. Defendant Williams told her she did not have a choice. While waiting for the ambulance to arrive, Plaintiff asked to sit, and the officers allowed her to sit facing to the side on the front passenger seat of her car.

Plaintiff asked for a tissue out of her purse. Defendant Williams obliged and, as he did, noticed several prescription medication bottles in the purse. At that time, Defendant Williams retrieved his camera from his patrol unit to photograph Plaintiff's Prius. Defendant Williams then read Plaintiff her rights, to which Plaintiff responded that she understood them and wished to terminate the interview.

The EMTs arrived and were briefed by Officer Skero. After speaking with Plaintiff and checking her blood sugar, one of the paramedics informed Defendant Williams that Plaintiff's blood sugar reading was normal and that she was oriented to time and place. Plaintiff volunteered that she had been in the hospital recently

for spinal surgery and that she had a torn rotator cuff and two knees that needed to be replaced.

After the EMTs had complete their examination, Defendant Williams repeatedly asked Plaintiff to stand so that he could transport her to jail, but Plaintiff refused to comply, saying that she would not leave her dog.  Defendant Williams explained that she was going to jail and could not take the dog with her.[9] Eventually, Officer Skero walked over to assist Defendant Williams.[10]  Defendant Williams eventually pulled Plaintiff out of her car by her left arm, and, when she was standing, Defendant Skero took her other arm.[11]  As they escorted her to Defendant Williams' car, Plaintiff screamed, "I want my dog!" and "No!" repeatedly.[12]  In between taking groups of a few steps with the officers, Plaintiff dragged her feet, attempted to squat while leaning forward, and/or kicked one or the other of her legs back toward her car as if attempting to take a step in that direction.[13]

---

[9]    See Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording.

[10]    See Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-17, Ex. 11-A to Def. Skero's Brief in Support of Summ. J., Def. Skero's Dash Cam Video Recording.

[11]    See Doc. 49-17, Ex. 11-A to Def. Skero's Brief in Support of Summ. J., Def. Skero's Dash Cam Video Recording.

[12]    See Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-17, Ex. 11-A to Def. Skero's Brief in Support of Summ. J., Def. Skero's Dash Cam Video Recording.

[13]    See Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-17, Ex. 11-A to Def. Skero's Brief in Support of Summ. J., Def. Skero's Dash Cam Video Recording.

Plaintiff screamed, "Let me go!"[14]  And she complained that Defendant Williams was breaking her arm and that the handcuffs were cutting into her arm.  Defendant Williams told her to "stop struggling," and her wrists would stop hurting.[15]  When they got to the passenger side of Defendant Williams' car, he opened the front door and instructed Plaintiff to sit down.[16]  He repeated that instruction more than once.[17]  Plaintiff later described the officers' actions, claiming that Officer Skero assisted Defendant Williams in "grabbing [her] neck and arms and dragging [her] to Defendant Williams' police car, where they pushed [her] into his car."

Defendant Williams told Plaintiff to sit up in the seat so that the seatbelt would fit properly.[18]  He informed Plaintiff that

---

[14]   See Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-17, Ex. 11-A to Def. Skero's Brief in Support of Summ. J., Def. Skero's Dash Cam Video Recording.

[15]   See Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-17, Ex. 11-A to Def. Skero's Brief in Support of Summ. J., Def. Skero's Dash Cam Video Recording.

[16]   See Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-17, Ex. 11-A to Def. Skero's Brief in Support of Summ. J., Def. Skero's Dash Cam Video Recording.

[17]   See Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording; Doc. 49-17, Ex. 11-A to Def. Skero's Brief in Support of Summ. J., Def. Skero's Dash Cam Video Recording.  The camera was trained on the area in front of Defendant Williams' car and did not capture the acts of seating Plaintiff in the car, buckling her seatbelt, and closing the car door.  See Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording.

[18]   See Doc. 49-8, Ex. 3-C to Def. Skero's Brief in Support of Summ. J., Def. Williams' Dash Cam Video Recording.

he was going to buckle her seatbelt.[19]   A few seconds later, Defendant Williams closed the passenger side door, eliciting no sound or comment from Plaintiff.[20]  Defendant Williams entered the other side of his patrol unit and sat in the driver's seat.  He turned on a second camera trained on Plaintiff.  Defendant told Plaintiff that she had been arrested for the offense of driving while intoxicated and read Plaintiff a statutory warning about the offense and the taking of a breath and/or blood sample.

Plaintiff sat in the car while Defendant Williams inventoried the contents of her car.   While alone in the car, Plaintiff repeated, "I want my dog," various curse words, and complaints. After awhile, she pushed the interior camera with her foot so that it was no longer pointing directly at her.   Defendant Williams returned, repositioned the camera, scolded Plaintiff for moving it, and warned her that if she touched it again, he would "strap [her] legs down."

Defendant Williams exited the vehicle and returned several more times while Plaintiff remained in the car.  When Defendant Williams was in the vehicle with her, Plaintiff asked questions about, inter alia, her dog, her property, her glasses, the charge, and any contact with her family.  She also complained about the handcuffs.  When Defendant Williams was not in the car, Plaintiff

---

[19]    See id.

[20]    See id.

7

cried, cursed, and twice more kicked the interior camera.  After the third kick, which dislodged the camera from the windshield, Defendant Williams strapped Plaintiff's legs.

After animal control had taken Plaintiff's dog, the wrecker had taken her car, and the 911 witness had filled out a witness statement, Defendant Williams drove Plaintiff to the Montgomery County jail.  Plaintiff continued talking to Defendant Williams about, inter alia, her dog, her property, her medical conditions, and the pain caused by the handcuffs; Defendant Williams responded occasionally.

Defendant Williams charged Plaintiff with the offense of Driving While Intoxicated.  Plaintiff was incarcerated at the Montgomery County jail.  Plaintiff did not recall whether she complained about her left-pinky injury[21] during her incarceration.[22] Based on photos of her upper extremities, Plaintiff testified that she suffered, during the arrest, bruises on her right arm, right wrist, and left elbow, scrapes on her right hand and right wrist, and "a big bump" on her left wrist near the top of the hand.[23]

---

[21]   See Doc. 128-3, Ex. B to Pl.'s Resp. to Def.'s 2d Mot. for Summ. J., Pl.'s Dep. p. 85 (stating the injury was to her left pinky).

[22]   Id. p. 88.

[23]   See id. pp. 132-38; Doc. 128-2, Ex. A to Pl.'s Resp. to Def.'s 2d Mot. for Summ. J., Photographs.  Plaintiff's testimony about the photographs is inconsistent in that she did not attribute duplicate photographs to the same cause.  See, e.g., Doc. 128-2, Ex. A to Pl.'s Resp. to Def.'s 2d Mot. for Summ. J., Photographs Bates Nos. 49, 53; Doc. 128-3, Ex. B to Pl.'s Resp. to Def.'s 2d Mot. for Summ. J., Pl.'s Dep. pp. 136, 137-38 (indicating that a photograph of a bruise on her left elbow at Bates No. 49 was not caused by Defendant Williams but that the identical photograph at Bates No. 53 showed an injury attributable

Plaintiff went to emergency room ("ER") immediately after her release "because of all the bruises I -- that I had sustained during the arrest and incarceration."[24]  She was x-rayed and "checked over for some lacerations" but could not recall what the examiners said about her injuries.[25]  Plaintiff could not recall whether she received a diagnosis for her left-pinky injury at the ER but did recall that she did not receive any treatment.[26]  The treatment notes from the ER visit are not in the summary judgment evidence.

In the month following Plaintiff's incarceration, a hand specialist, whose name Plaintiff could not recall, conducted a nerve induction test.[27]  Plaintiff was unable to recall whether she saw him more than once.[28]  Although Plaintiff believed that she had been diagnosed with nerve damage in her left pinky, she could not recall by whom or when after arrest that may have occurred.[29]  She did recall that she had not received any treatment for the left-

---

to Defendant Williams' slamming of the car door).  Also, Plaintiff did not state on what date the photographs were taken.  See Doc. 128-3, Ex. B to Pl.'s Resp. to Def.'s 2ᵈ Mot. for Summ. J., Pl.'s Dep. pp. 132-38.

[24]    Id. p. 16.

[25]    Id. pp. 16-17, 85.

[26]    See id. pp. 88-89.

[27]    See id. p. 17-18.  In the deposition discussion of treatment received for her alleged injuries, Plaintiff stated, "I believe I recall a hand specialist, because I have nerve damage on this finger (indicating)."  Id. p. 17.

[28]    See id. p. 18.

[29]    See id. p. 88.

pinky injury.[30]  No medical records from the appointment(s) with the hand specialist are in the summary judgment evidence.

After the arrest, Plaintiff continued to receive treatment from George S. Leventon, M.D., Ph.D., ("Dr. Leventon"), the psychiatrist who had treated her previously.[31]  She testified that she saw Dr. Leventon after the arrest for injuries she sustained but did not elaborate on the nature and degree of injuries.[32] According to Plaintiff, she had monthly telephonic appointments with Dr. Leventon.[33]  Records from those sessions are not in the summary judgment evidence.  The only document from Dr. Leventon is a letter to an attorney dated January 17, 2013, indicating that he had treated Plaintiff for chronic depression and anxiety since September 2000.[34]  The letter listed conditions that "complicated her situation," informed the attorney of Plaintiff's difficulty with traveling long distances, and described a new treatment she was to start and its side effects.[35]

Her medical records from the months following the incident indicate that she saw several doctors for a variety of health

---

[30]   See id.

[31]   See id. pp. 13-14.

[32]   See id. p. 15.

[33]   See id.

[34]   See Doc. 125, Sealed Ex. 1 to Def.'s 2d Mot. for Summ. J., Medical Records p. 4.

[35]   Id.

concerns but never sought treatment for her alleged injuries resulting from the force used by Defendant Williams.[36]  According to the medical records, she informed two of her physicians of her arrest but did not complain of any resulting injury.[37]  Plaintiff testified that she also informed two other physicians about her arrest.  Brad Weiner, M.D., noted on March 6, 2012, that Plaintiff had called to inform him of the arrest but that Plaintiff's back and neck were okay and "there [wa]s certainly nothing worrisome going on in regards to those things at th[at] point."[38]

## II.  Summary Judgment Standard

Summary judgment is warranted when the evidence reveals that no genuine dispute exists regarding any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Stauffer v. Gearhart, 741 F.3d 574, 581 (5th Cir. 2014).  A material fact is a fact that is identified by applicable substantive law as critical to the outcome of the suit.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Ameristar Jet Charter, Inc. v. Signal Composites, Inc., 271 F.3d 624, 626 (5th Cir. 2001).  To be genuine, the dispute regarding a material fact must be supported by

---

[36]    See id. pp. 10-25.

[37]    See, e.g., id. pp. 10, 12.

[38]    Id. p. 10; see also id. p. 19 (complaining of neck pain in May 2012 to her primary care physician and suggesting that hula hooping may have caused it).

evidence such that a reasonable jury could resolve the issue in favor of either party. See Royal v. CCC & R Tres Arboles, L.L.C., 736 F.3d 396, 400 (5th Cir. 2013)(quoting Anderson, 477 U.S. at 248).

The movant must inform the court of the basis for the summary judgment motion and must point to relevant excerpts from pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of genuine factual issues. Celotex Corp., 477 U.S. at 323; Topalian v. Ehrman, 954 F.2d 1125, 1131 (5th Cir. 1992). The movant may meet this burden by demonstrating an absence of evidence in support of one or more elements of the case for which the nonmovant bears the burden of proof. See Celotex Corp., 477 U.S. at 322; Exxon Corp. v. Oxxford Clothes, Inc., 109 F.3d 1070, 1074 (5th Cir. 1997).

If the moving party carries its burden, the nonmovant may not rest on the allegations or denials in his pleading but must respond with evidence showing a genuine factual dispute. Stauffer, 741 F.3d at 581 (citing Hathaway v. Bazany, 507 F.3d 312, 319 (5th Cir. 2007)). Conclusory allegations, unsubstantiated assertions, improbable inferences, unsupported speculation, or only a scintilla of evidence will not carry this burden. Brown v. City of Houston, 337 F.3d 539, 540-41 (5th Cir. 2003).

If the evidence would not allow a reasonable jury to decide the dispute in favor of the nonmovant, the dispute is not genuine.

See <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007)(citing <u>Matsushita</u> <u>Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986)).  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  <u>Id.</u>

### III.  Constitutional Standards

A plaintiff can establish a prima facie case under 42 U.S.C. § 1983[39] ("Section 1983") for the deprivation of civil rights by establishing: (1) a violation of a federal constitutional or statutory right; and (2) that the violation was committed by an individual acting under the color of state law.  <u>Doe v. Rains Cnty.</u> <u>Indep. Sch. Dist.</u>, 66 F.3d 1402, 1406 (5th Cir. 1995).  The statute creates no substantive rights but only provides remedies for deprivations of rights created under federal law.  <u>Graham v.</u> <u>Connor</u>, 490 U.S. 386, 393-94 (1989).

Government officials have qualified immunity from Section 1983 "liability for civil damages insofar as their conduct does not

---

[39]     The provision reads, in relevant part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.

violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Pearson v. Callahan</u>, 555 U.S. 223, 231 (2009)(quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)). Qualified immunity protects an officer regardless of whether the error was "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." <u>Pearson</u>, 555 U.S. at 231 (quoting <u>Groh v. Ramirez</u>, 540 U.S. 551, 567 (2004)). "[A] defendant's acts are held to be objectively reasonable unless *all* reasonable officials in the defendant's circumstances would have then known that the defendant's conduct violated the United States Constitution or the federal statute as alleged by the plaintiff." <u>Thompson v. Upshur Cnty.</u>, 245 F.3d 447, 457 (5th Cir. 2001)(emphasis in original).

By invoking qualified immunity, a summary judgment movant shifts the burden to the nonmovant to rebut the movant's assertion. <u>Cantrell v. City of Murphy</u>, 666 F.3d 911, 918 (5th Cir. 2012); <u>Brumfield v. Hollins</u>, 551 F.3d 322, 326 (5th Cir. 2008). Although no longer mandatory, the two-step process set out by the court in <u>Saucier v. Katz</u>, 533 U.S. 194 (2001), still provides guidance in analyzing qualified immunity. <u>See</u> <u>Pearson</u>, 555 U.S. at 236, 242 (stating that the <u>Saucier</u> analytic method "should no longer be regarded as mandatory" but allowing that it may be "worthwhile in particular cases"). The first step is determining whether the officer's conduct violated a constitutional right. <u>Hope v. Pelzer</u>,

14

536 U.S. 730, 736 (2002).  The second step is to determine whether the officer's actions were objectively reasonable in light of clearly established law at the time of the violation.  Id. at 739.

The Fourth Amendment,[40] applied to state actors through the Fourteenth Amendment, protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  A claim of excessive force during arrest falls under the protection of the Fourth Amendment.  See Graham, 490 U.S. at 388.  In order to establish an excessive-force claim, a plaintiff must show: (1) an injury; (2) that resulted directly and only from the use of force that was excessive; and (3) the force used was unreasonable.  Carnaby v. City of Houston, 636 F.3d 183, 187 (5th Cir. 2011)(citing Freeman v. Gore, 483 F.3d 404, 416 (5th Cir. 2007)); Glenn v. Tyler, 242 F.3d 307, 314 (5th Cir. 2001).  The burden is on the plaintiff to prove each of these elements.  See Tarver v. City of Edna, 410 F.3d 745, 751 (5th Cir. 2005).

The plaintiff's resulting injury need not be significant but must be more than de minimis.  Lockett v. New Orleans, 607 F.3d 992, 999 (5th Cir. 2010)(citing Glenn, 242 F.3d at 314).  Whether

---

[40]     The full text of the Fourth Amendment is:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

an injury is sufficient to support an excessive-force claim is dependent on the context in which the injury occurred and is directly related to the constitutionality of the force applied. Williams v. Bramer, 180 F.3d 699, 704 (5th Cir. 1999); Freeman, 483 F.3d at 416.

The particular context also factors into whether the officer acted reasonably in terms of the amount of force deployed.  See Tarver, 410 F.3d at 751-53.  "The objective reasonableness of the force . . . depends on the facts and circumstances of the particular case, such that the need for force determines how much force is constitutionally permissible." Collier v. Montgomery, 569 F.3d 214, 218-19 (5th Cir. 2009).  Reasonableness considerations regarding the need for and the amount of force necessary include whether the suspect posed an immediate threat to the officer or to the public and whether the suspect was actively resisting arrest or attempting to evade arrest.  Id. at 219.  Reasonableness is judged from the perspective of a reasonable officer on the scene, not in hindsight.  Ramirez v. Knoulton, 542 F.3d 124, 128 (5th Cir. 2008).

The right to effect an arrest "necessarily carries with it the right to use some degree of physical coercion." Graham, 490 U.S. at 396.  The Fifth Circuit does not recognize handcuffing too tightly, without more, to rise to the level of a constitutional harm.  Lockett, 607 F.3d at 999 (citing Glenn, 242 F.3d at 314).

### III. Analysis

Plaintiff pled that Defendant Williams handcuffed her too tightly, and she "developed bruises and open wounds from them, but Defendant Williams refused to loosen the cuffs."[41] She also alleged that she had ongoing nerve damage in her left pinky finger as a result of "the tightness of the handcuffs and the use of unnecessary, excessive force."[42] According to Plaintiff's pleading, Defendant Williams "grabbed Plaintiff by the neck and shoulder, pushed her to his car."[43] At another place in her complaint, Plaintiff alleged that Defendant Williams and Skero dragged her from her car and shoved her into Defendant Williams' car.[44] She claimed mental anguish, damage to her reputation, "extreme physical discomfort," "extreme pain, mental duress and humiliation."[45] Plaintiff alleged that Defendant Williams' actions violated the Eighth Amendment.

The only basis on which Defendant Williams originally moved for summary judgment on Plaintiff's excessive-force claim was Plaintiff's failure to plead the claim pursuant to the protection of the Fourth Amendment. In its Memorandum and Recommendation, the court refused to grant summary judgment solely on that basis and

---

[41]     Doc. 39, Pl.'s 2ᵈ Am. Compl. pp. 6, 15.

[42]     Doc. 39, Pl.'s 2ᵈ Am. Compl. pp. 6, 15.

[43]     Id.

[44]     Id. p. 10.

[45]     Id. pp. 10, 16.

found that Plaintiff had pled sufficient facts to state a cause of

action for excessive force under the applicable Fourth Amendment.

The court further stated:

> Moreover, Plaintiff testified at her deposition that she suffered injuries as a result of Defendant Williams' handcuffing her, escorting her to his patrol unit, and placing her in the patrol unit.   She presented photographs at the deposition that she claimed showed resulting injuries to her wrists and arms and testified that she also experienced numbness in one of the fingers in her left hand.  Plaintiff stated that she went to the emergency room immediately after being released from detention.
> The court cannot determine from the summary judgment evidence whether Plaintiff's injuries were more than de minimis or whether they directly resulted from Defendant Williams' use of excessive force that was unreasonable. Ultimately, if the evidence shows only that Plaintiff suffered minor wrist injuries from Defendant Williams' handcuffing too tightly, she cannot prevail.  See Glenn, 242 F.3d at 314 (finding "that handcuffing too tightly, without more, does not amount to excessive force").  For now, though, the court finds that Plaintiff has raised a fact issue on her excessive force claim against Defendant Williams.[46]

Defendant Williams filed the second motion for summary

judgment, raising qualified immunity to Plaintiff's excessive-force

claim under Fourth Amendment standards.  He argues that Plaintiff's

medical records do not support the allegation that she suffered an

injury, that she cannot show that Defendant Williams acted with

malice, and that he followed standard arrest procedures.

In her response to Defendant Williams' motion, Plaintiff added

the allegation that Defendant Williams slammed the door of his

---

[46]    Doc. 103, Mem. & Recommendation Dated Feb. 27, 2015 pp. 68-69 (footnotes omitted).

patrol unit on her arm.[47]   In the response, Plaintiff claimed "extensive bruises, scrapes, and swelling to her arm, elbow, and wrist," as well as "long-term nerve damage to her finger" that continued to cause numbness in the finger "to this day."[48]

Plaintiff's response primarily focuses on her own "fragile physical state at the time of her arrest[] and [argues] that a heightened level of care was required to have been followed in using physical force against her."[49]   Plaintiff cites no legal authority to support the assertion that a heightened level of care applies to physically fragile arrestees, and the court has found none.   To the extent her contention is that Defendant Williams' knew of her pre-existing physical conditions and intentionally used force to exacerbate those medical ailments, the argument is a red herring.   None of the injuries that Plaintiff allegedly suffered are related to any of her self-reported pre-existing physical conditions.[50]

---

[47]    See Doc. 128, Pl.'s Resp. to Def. Williams' 2$^d$ Mot. for Summ. J. p. 1.  This allegation is also absent from Plaintiff October 7, 2014 affidavit but is mentioned by Plaintiff in her deposition of November 12, 2014.  See Doc. 74-1, Ex. 1 to Pl.'s Surreply to Officer Skero's Reply to Pl.'s Resp. to Officer Skero's Mot. for Summ. J., Pl.'s Aff. ¶ 13; Doc. 128-3, Ex. B to Pl.'s Resp. to Def.'s 2$^d$ Mot. for Summ. J., Pl.'s Dep. p. 138.

[48]    Doc. 128, Pl.'s Resp. to Def.'s 2$^d$ Mot. for Summ. J. p. 1.

[49]    Doc. 128, to Pl.'s Resp. to Def.'s 2$^d$ Mot. for Summ. J. p. 10; see also id. pp. 7-12.

[50]    In Tarver, the Fifth Circuit suggested that the key issue with arrestees who have pre-existing conditions remains, as in other cases, whether the injuries resulted directly and only from the use of force, not whether the pre-existing conditions contributed to the resulting health issues.  See Tarver, 410 F.3d at 752 (stating that the summary judgment evidence there adequately established that the injuries were caused solely by the officer's conduct rather

Having disposed of Plaintiff's first argument, the court turns to question whether Plaintiff has produced evidence of a constitutionally relevant injury. Plaintiff must have suffered an injury that was more than de minimis and resulted directly and only from Defendant Williams' use of force that was objectively excessive to the need. On summary judgment, it is Plaintiff's burden to produce evidence that raises a genuine issue of material fact on each of these requirements.

The question of whether excessive force was employed during an arrest is not a new one for the courts in the Fifth Circuit. In 1999, the Fifth Circuit addressed a situation in which a detainee alleged that a police officer choked the detainee twice, once while searching his mouth for hidden drugs and once after the detainee threaten to file a report on the officer. See Williams, 180 F.3d at 700-02. The relevant portion of the court's opinion dealt with making the determination whether a constitutionally cognizable injury had occurred. See id. at 703-04.

The court noted that the plaintiff alleged suffering the same physical injury from both choking episodes (dizziness, loss of breath, and coughing) but found that the two differed in context.

---

than from a preexisting condition); May v. Busby, C.A. No. C-11-069, 2012 WL 896339, at *6 (S.D. Tex. Mar. 15, 2012)(unpublished)(stating that the plaintiff claimed that he was disabled by health conditions but did not attribute his medical ailments or the aggravation of pre-existing conditions to the officer). The court here examines the summary judgment evidence to determine whether Plaintiff can establish that the injuries she claims from Defendant William's use of force are more than de minimis and can be traced directly and only to his use of force without regard for her pre-existing conditions.

See id. at 704.   The court found that the alleged choking that
occurred during the search of the plaintiff's mouth was not a
cognizable injury because the physical search of an individual
inevitably results in a physical confrontation.   See id. The force
employed was not excessive given the context.   See id.   However,
the second choking instance was motivated entirely by malice;
therefore, the officer was "not legitimately exercising force in
the performance of his duties."   Id.

In 2001, the Fifth Circuit faced a claim by an arrestee that
she had been handcuffed "so tightly that her right hand became
swollen." Glenn, 242 F.3d at 311.  Even though she complained that
the handcuffs were too tight, the officer did not loosen them.  See
id.  "She also assert[ed] that she was left in an unventilated
vehicle which was placed in the 'baking sun' for almost an hour
before she was taken to jail, despite her pleas that she could not
take the heat because of her multiple sclerosis." Id.  The court
concluded there that the plaintiff's swollen right wrist from
handcuffing too tightly was not a constitutionally cognizable
injury and made the broader finding "the handcuffing too tightly,
without more does not amount to excessive force." Id. at 314; see
also Freeman, 483 F.3d at 416 (finding that bruises and marks on
wrists and arms from handcuffing too tightly, twisting arms behind
the arrestee's back, and "jerk[ing]" the arrestee all over a
carport did not state a claim for excessive force).  The court

21

noted that there was no allegation that the officer had acted with malice.  See Glenn, 242 F.3d at 314.

In 2005, the Fifth Circuit addressed the case of an arrestee whose wife had informed the officer of several medical conditions from which the arrestee suffered.  See Tarver, 410 F.3d at 749. The officer had responded, "I don't care."  Id.  The officer forcibly handcuffed the arrestee and placed him in the back of the police car with the air conditioner turned off.  See id.  The officer twice slammed the car door when the arrestee's family members opened it to check on him.  Id.  On the first occasion, the slamming car door hit the arrestee's foot, knocking off his shoe and injuring his back, and, on the second occasion, the door hit the arrestee's head and bounced back open.  See id.

The excessive-force claim was based on the handcuffing and the slamming of the door twice.  See id.  The arrestee claimed physical injuries, emotional pain and suffering, mental anguish, headaches, and depression and claimed that he required surgery as a result. See id.  The "acute contusions of the wrist" and "psychological injury from being handcuffed" were not enough to state an excessive-force claim.  Id. at 751.  The court recognized the absence of malicious or intentional infliction of harm in handcuffing the arrestee.  See id.  The court cited favorably an Eighth Circuit opinion that required medical records that established permanent injury before allowing handcuffing to give

rise to an excessive-force claim. See id. at 752 (citing Crumley v. City of St. Paul, 324 F.3d 1003, 1008 (8th Cir. 2003)).

The Fifth Circuit determined that the plaintiff had raised a question of material fact regarding the slamming of the door. See id. at 753. The officers did not dispute that the plaintiff had suffered injuries resulting directly and only from the two incidences of slamming the car door. See id. at 752. The only remaining jury issue was whether the excessiveness of slamming the door was clearly unreasonable. See id. at 753.

District courts in the Fifth Circuit also have had ample opportunities to apply these excessive-force standards to situations similar to Plaintiff's. In 2006, a district court examined a physical encounter at a school between a parent and a police officer for the school district. See Houston-Hines v. Houston Indep. Sch. Dist., No. Civ.A. H-04-3539, 2006 WL 870459, at **1-2 (S.D. Tex. Apr. 5, 2006)(unpublished). After the encounter, a mother denied resisting arrest but admitted "moving her hands around so [the officer] could not get the handcuffs on her wrists." Id. at *2. While the officer was trying to handcuff the mother, her daughter entered the office and "began grabbing and hitting the officer." Id. After he handcuffed the mother, he handcuffed the daughter; both were arrested. See id. The mother suffered scratches and bruises from the encounter, and the daughter, who was treated for asthma at the scene and then transported to the

hospital, "was sore for about a week following the incident." <u>Id.</u>
In addition to those physical complaints, both mother and daughter
claimed psychological injuries. <u>See</u> <u>id.</u> at *5.

The court found that the mother's scratches and bruises and
the daughter's soreness were no more than de minimis injuries. <u>See</u>
<u>id.</u> Although they claimed psychological injuries, neither sought
mental-health treatment until after the case had been filed. <u>See</u>
<u>id.</u> The court, thus, found the alleged psychological injuries to
be de minimis as well. <u>See</u> <u>id.</u> An interesting aspect of the
court's decision was the finding that, even if they had established
injuries greater than de minimis, their own actions in moving hands
about to prevent handcuffing and pulling on and hitting the officer
would have resulted in some scratches, bruises, and soreness. <u>See</u>
<u>id.</u> Because of that, the court concluded that the mother and
daughter failed to present evidence that their injuries resulted
directly and only from the officer's use of force. <u>See</u> <u>id.</u>

The Western District of Louisiana reached a similar result in
2008, when considering an excessive-force claim that an officer
pushed an individual with a flashlight, causing the civilian's back
to be "a little tight" for about a week. <u>See</u> <u>Kennedy v. City of</u>
<u>Shreveport</u>, Civil Action No. 07-1049, 2008 WL 2437043, at *4 (W.D.
La. June 13, 2008)(unpublished). The civilian was "unable to
remember the name of the physician he visited or what injuries he
described to that physician," and the medical records did not

24

contain any record of a doctor appointment following the incident for complaints of physical pain.  Id.  The civilian also claimed a psychological injury but did not receive counseling until one week after his deposition.  Id.

The court found the civilian's injuries to be no more than de minimis in that context.  See id.; Frakes v. Masden, 2015 WL 1637893, Civil Action No. H-14-1753, at **6-7 (S.D. Tex. Apr. 13, 2015)(slip copy)(finding that the plaintiff's excessive-force claim failed because he did not seek or obtain medical treatment for the alleged physical injuries and did not present evidence of any treatment for his alleged fear of the police and because the minimal force of pulling the plaintiff's arm behind his back for handcuffing was not clearly excessive to the need); Viñas v. Serpas, Civil Action No. 10-03211, 2011 WL 4403989, at **1, 2 (E.D. La. Sept. 21, 2011)(finding nothing in the record to establish an injury because, although the plaintiff complained that the handcuffing was too tight, he did not report any injury to his wrists when he arrived at the jail after his arrest and he never received any treatment for his wrists).

Plaintiff, in the case sub judice, has failed to present evidence that raises a genuine issue of material fact on any of the three elements of an excessive-force claim.  As set forth above, Plaintiff must show that she suffered (1) an injury (2) that resulted directly and only from the use of force that was excessive

and (3) unreasonable.  <u>Carnaby</u>, 636 F.3d at 187; <u>Glenn</u>, 242 F.3d at 314.

Plaintiff pled two occurrences of excessive force: (1) handcuffing too tightly; and (2) grabbing her by the neck and shoulder, pushing and dragging her to Defendant Williams' patrol car, and shoving Plaintiff into the patrol car.  Plaintiff added a third, unpled occurrence in her deposition and response to summary judgment: slamming the door of the patrol car on Plaintiff's elbow. Because Plaintiff did not plead the slamming of the door, she may not raise it at the summary judgment stage.[51]

As a result of handcuffing too tightly, Plaintiff contends, she suffered bruises, open wounds, scrapes, swelling, ongoing nerve damage in her left pinky, and psychological harm.  The first four of these alleged injuries amount to nothing more than de minimis injuries that cannot support an excessive-force claim for handcuffing.  The Fifth Circuit has repeatedly held that swelling, bruises, and other marks on the wrists and arms caused by handcuffing are de minimis injuries.  <u>See</u> <u>Freeman</u>, 483 F.3d at 416; <u>Tarver</u>, 410 F.3d at 751; <u>Glenn</u>, 242 F.3d at 314.

Ongoing nerve damage, on the other hand, is a more significant injury that, in certain cases, might support a claim for the excessive use of force in handcuffing.  Also, psychological harm

---

[51]    Even if the court allowed that allegation to stand, it would not survive summary judgment because the resulting bruise on her elbow was a de minimis injury.

can serve as a basis for an excessive-force claim.  See Tarver, 410
F.3d at 752; Flores v. City of Palacios, 381 F.3d 391, 400-01 (5th
Cir. 2004).   Both of these alleged injuries fail to support
Plaintiff's excessive-force claim, in this case, because Plaintiff
produced no evidence, other than her own equivocal testimony, to
show that she received any diagnosis or treatment for these alleged
injuries.

   At her deposition, Plaintiff could not recall what any of the
doctors at the ER said about her injuries, and she could not recall
whether she received a diagnosis for her left-pinky injury but
could recall that she received no treatment for it.[52]  The ER
records are not in the summary judgment evidence.

   Plaintiff testified that "she believe[d] [she] recall[ed] a
hand specialist."[53]  At another point, she testified that she indeed
saw a hand specialist in the month following her arrest and that
the hand specialist conducted a nerve induction test.[54]  She could
not recall his name or whether she saw him more than once.[55]  She
did not testify about the results or whether he made any diagnosis
related to her left-pinky injury.  Plaintiff responded, "I believe
so" when asked if she had ever been diagnosed with nerve damage in

---

[52]   See Doc. 128-3, Ex. B to Pl.'s Resp. to Def.'s 2d Mot. for Summ. J.,
Pl.'s Dep. pp. 16-17, 88-89.

[53]   See id. p. 17.

[54]   See id. pp. 17-18.

[55]   See id. pp. 17-18.

her left pinky but could not recall when or by whom.[56]   She definitively stated that she had never received any treatment for her left pinky.[57]  The summary judgment evidence includes no records from a hand-specialist or any other medical professional who examined, diagnosed, and/or treated Plaintiff for an injury to her left pinky.   In the months following her arrest, Plaintiff saw several physicians and mentioned the arrest to more than one, but never complained of any injury sustained during the arrest.

Plaintiff testified that she continued to see Dr. Leventon, her psychiatrist, after the arrest and that he treated her for psychological injuries incurred during the arrest.   The only evidence from Dr. Leventon is a letter that was written in January 2013, nearly a year after her arrest.   It does not mention the arrest or any resulting psychological harm.

The summary judgment record not only lacks any evidence of diagnosis and treatment of Plaintiff's alleged injuries, but the medical records from that time period that are in the record reflect no physical or psychological harm as a result of the use of force during her arrest.[58]   There is no evidence that Plaintiff

---

[56]     See id. p. 88.

[57]     See id.

[58]     In the alternative, Plaintiff requested a continuance pursuant to Federal Rule of Civil Procedure 56 "to obtain such evidence from Plaintiff's treating physician and medical provider."  Doc. 128, Pl.'s Resp. to Def.'s 2[d] Mot. for Summ. J. p. 15.  Plaintiff cites the stay of discovery as the reason she has not produced her own medical records.  The evidence she seeks is within her control; it is not evidence that would be produced in discovery.  Plaintiff's request is **DENIED**.

suffered more than de minimis injuries,[59] much less any evidence of a permanent injury. See Tarver, 410 F.3d at 752 (citing Crumley, 324 F.3d at 1008)(suggesting that evidence establishing a permanent injury would be necessary to give rise to an excessive-force claim based on handcuffing). Plaintiff's self diagnosis will not carry her claim.

As to her other alleged occurrence of excessive force, Plaintiff pled no specific physical injuries resulting from the grabbing, pushing, dragging, and shoving in connection with Defendant Williams' escorting Plaintiff to his patrol car. Extreme physical discomfort and pain are fleeting sensations that amount to no more than de minimis injuries. To the extent that Plaintiff asserts that she suffered psychological harm from this occurrence, it fails for the reasons explained above.

Even if Plaintiff's alleged injuries could satisfy the injury requirement, her excessive-force claim still would fail for lack of evidence that her injuries resulted directly and only from the use of force that was excessive to the need. In order to show that Plaintiff's injuries, particularly her alleged nerve damage and psychological harm, resulted directly and only from Defendant Williams' conduct, Plaintiff would need a physician's statement or the testimony of an expert. Plaintiff's lay testimony attributing

---

[59]    The Fifth Circuit has allowed that a de minimis injury may support an excessive-force claim under certain circumstances if the officer acted with malice. See Glenn, 242 F.3d at 314.

these alleged injuries to Defendant Williams' actions is not sufficient. A physician or expert's opinion on the issue is necessary to rule out all other possible causes and to confirm that the force used by Defendant Williams in this case was a viable cause of Plaintiff's left-pinky injury and psychological harm.

Additionally, the videos of Plaintiff's arrest indisputably reflect that Plaintiff resisted arrest, albeit not violently. She refused to comply with Defendant Williams' orders to turn around so that he could handcuff her and to stand and walk with him to his patrol car. Plaintiff's resistance, particularly the pulling against the officers as they escorting her to Defendant Williams' patrol car, caused her pain and, most assuredly, resulted in bruises and swelling on her wrists.[60] The evidence supports this conclusion. As Plaintiff was struggling against being escorted, she exclaimed that Defendant Williams was breaking her arm and that the handcuffs were cutting into her arm. Defendant Williams recommended that she stop struggling to avoid the pain. Any injury resulting from Plaintiff's own actions is not cognizable. See Houston-Hines, 2006 WL 870459, at *5 (observing that injuries caused by arrestees' own actions do not result directly and only from the defendant's use of force).

Whether the alleged injury is cognizable is a question that is

---

[60]   Plaintiff's repeated kicking of the camera in Defendant Williams' patrol car certainly also may have caused injury.

inextricably connected to whether the use of force was objectively reasonable. <u>Johnson v. Morel</u>, 876 F.2d 477, 479-80 (5th Cir. 1989), <u>abrogated on other grounds</u> ("Injuries which result from, for example, an officer's justified use of force to overcome resistance to arrest do not implicate constitutionally protected interests."); <u>Cooper v. Killeen Indep. Sch. Dist.</u>, No. A-07-CA-082 LY, 2008 WL 194358, at **3-5 (W.D. Tex. Jan. 23, 2008)(unpublished)(citing <u>Flores</u>, 381 F.3d at 399)("The amount of injury necessary to satisfy the requirement of 'some injury' and establish a constitutional violation is directly related to the amount of force that is constitutionally permissible under the circumstances."). Plaintiff's refusal to comply with Defendant Williams' instructions justified Defendant Williams' increased physical response to Plaintiff. <u>See also</u> <u>Crumley</u>, 324 F.3d at 1008 ("Resistance may justify the use of greater force.").

Because Plaintiff has failed to produce evidence that raises a genuine issue of material fact on any of the elements of an excessive-force claim, Plaintiff has not raised a fact issue on whether Defendant Williams violated Plaintiff's constitutional right to be free of the use of excessive force. The court need not continue with the analysis of qualified immunity. Defendant Williams is entitled to the protection of qualified immunity for Plaintiff's excessive-force claim.

## IV.  Conclusion

Based on the foregoing, the court **RECOMMENDS** that Defendant Williams' Second Motion for Summary Judgment be **GRANTED**.

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections thereto pursuant to Rule 72(b) and General Order 2002-13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk electronically. Copies of such objections shall be mailed to opposing parties and to the chambers of the undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

**SIGNED** in Houston, Texas, this 9th day of October, 2015.

U.S. MAGISTRATE JUDGE

32